# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 22, 2013

No. 10-10751

Lyle W. Cayce
Clerk

VILLAS AT PARKSIDE PARTNERS, doing business as Villas at Parkside; LAKEVIEW AT PARKSIDE PARTNERS, LIMITED, doing business as Lakeview at Parkside; CHATEAU RITZ PARTNERS, doing business as Chateau De Ville; MARY MILLER SMITH;

Plaintiffs – Appellees

v.

THE CITY OF FARMERS BRANCH, TEXAS,

Defendant – Appellant

---

VALENTIN REYES; ALICIA GARZA; GINGER EDWARDS; JOSE GUADALUPE ARIAS; AIDE GARZA

Plaintiffs – Appellees

v.

CITY OF FARMERS BRANCH

Defendant – Appellant

Appeals from the United States District Court
for the Northern District of Texas

10-10751

Before STEWART, Chief Judge, and REAVLEY, JOLLY, DAVIS, JONES, SMITH, DENNIS, CLEMENT, PRADO, OWEN, ELROD, SOUTHWICK, HAYNES, GRAVES, and HIGGINSON, Circuit Judges.[*]

HIGGINSON, Circuit Judge, joined by CARL E. STEWART, Chief Judge, and W. EUGENE DAVIS, LESLIE H. SOUTHWICK, and HAYNES, Circuit Judges.

"America's history has long been a story of immigrants."[1] That story, a complicated history of inclusion and exclusion,[2] has unfolded according to law, but also contrary to law. *See Ex parte Kumezo Kawato*, 317 U.S. 69, 73-74 (1942) (the United States is "a country whose life blood came from an immigrant stream."). As the Supreme Court has emphasized—and indeed, as a constitutional imperative—a country's treatment of non-citizens within its borders can gravely affect foreign relations. *Hines v. Davidowitz*, 312 U.S. 52, 62-68 (1941); *Arizona v. United States*, 132 S. Ct. 2492, 2498-99 (2012) ("It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States.").

The Ordinance at issue in this case and passed by the active citizens of the City of Farmers Branch ("Farmers Branch") seeks to regulate non-citizens

---

[*] Judge King did not participate in this decision.

[1] Proclamation No. 6398, 56 Fed. Reg. 66,951 (Dec. 23, 1991) (Presidential speech commemorating the hundredth anniversary of Ellis Island).

[2] *See* J. Shklar, American Citizenship: The Quest for Inclusion, 5 (1991).

who reside in the United States contrary to law. Farmers Branch, Tex., Ordinance 2952 (Jan. 22, 2008), *permanently enjoined by Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 701 F. Supp. 2d 835, 881 (N.D. Tex. 2010). Farmers Branch classifies these non-citizens as persons "not lawfully present in the United States." *Id.* at §§ 1(D)(2); 3(D)(2). Responding to an "aroused popular consciousness," *Baker v. Carr*, 369 U.S. 186, 270 (1962) (Frankfurter, J., dissenting), and frustration at the perceived lack of federal enforcement of immigration law, Farmers Branch sought to "prevent" such persons from renting housing in the city. The district court concluded, *inter alia*, that the Ordinance was conflict preempted under federal law. *Villas at Parkside Partners*, 701 F. Supp. 2d at 881. Because we hold that the Ordinance's criminal offense and penalty provisions and its state judicial review process conflict with federal law, we AFFIRM the judgment of the district court.

## I.     Farmers Branch, Texas, Ordinance 2952

Ordinance 2952 sets forth licensing provisions and criminal sanctions. The Ordinance requires individuals to obtain a license before occupying a rented apartment or "single-family residence." Ordinance 2952 at §§ 1(B)(1); 3(B)(1). For persons not declaring themselves citizens or nationals of the United States, Farmers Branch's building inspector must verify "with the federal government whether the occupant is an alien lawfully present in the United States." *Id.* at §§ 1(D)(1); 3(D)(1). Upon such inquiry, if the federal government twice "reports" that the occupant is "not lawfully present in the United States," then the building inspector must revoke the occupant's license

after notifying both the occupant and the landlord. *Id.* at §§ 1(D)(1)-(4); 3(D)(1)-(4). The Ordinance provides that "[a]ny landlord or occupant who has received a deficiency notice or a revocation notice may seek judicial review of the notice by filing suit against the building inspector in a court of competent jurisdiction in Dallas County, Texas." *Id.* at §§ 1(E)(1); 3(E)(1).

The Ordinance's criminal provisions prohibit persons from occupying a rented apartment or single-family residence without first obtaining a valid license, *id.* at §§ 1(C)(1); 3(C)(1); 5, and making a false statement of fact on a license application, *id.* at §§ 1(C)(2); 3(C)(2); 5. Landlords, in turn, are prohibited from renting an apartment or single-family residence without obtaining licenses from the occupants, *id.* at §§ 1(C)(4); 3(C)(4); 5, failing to maintain copies of licenses from all known occupants, *id.* at §§ 1(C)(5); 3(C)(5); 5, failing to include a lease provision stating that occupancy by a person without a valid license constitutes default, *id.* at 1(C)(6); 3(C)(6); 5, and allowing an occupant to inhabit an apartment without a valid license, *id.* at 1(C)(7); 3(C)(7); 5. If a landlord commits the criminal offense of knowingly permitting an occupant to remain in an apartment or single-family residence without a valid license, *id.* at §§ 1(C)(7); 3(C)(7), then the building inspector shall suspend the landlord's rental license until the landlord submits a sworn affidavit stating that the occupancy has ended, *id.* at §§ (D)(5)-(7); (D)(5)-(7). A landlord may appeal the suspension of a rental license to the city council. *Id.* at §§1(D)(8); 3(D)(8). The Ordinance also criminalizes creating, possessing, selling or distributing a counterfeit license. *Id.* at §§ 1(C)(3), 3(C)(3), 5.

These seven offenses are Class C criminal misdemeanors punishable by

a fine of $500 upon conviction, *see* Tex. Penal Code Ann. §12.41(3) (West 2009); *State v. Chacon*, 273 S.W.3d 375, 377 n.2 (Tex. App. 2008); Ordinance 2952 at §§ 1(C); 3(C); 5, with a separate offense deemed committed each day that a violation occurs or continues, *id.* at § 5.  In Texas, local police may make arrests for Class C misdemeanors.  *See* Tex. Code Crim. Proc. Ann. art. 14.01(b), 14.06(a)-(b) (West 2011).

## II.   Supremacy Clause Litigation and the Supreme Court's Intervening Decision in *Arizona v. United States*

Two groups of plaintiffs,0 comprised of landlords and tenants, sued the City, seeking to enjoin the Ordinance.  *Villas at Parkside Partners v. City of Farmers Branch,* 701 F. Supp. 2d 835 (N.D.  Tex. Mar. 24, 2010).  The district court found the Ordinance to be preempted under the Supremacy Clause, both as an improper regulation of immigration because it "applies federal immigration classifications for purposes not authorized or contemplated by federal law," *id.* at 860; *see generally DeCanas v. Bica*, 424 U.S. 351, 355 (1976), and also as an obstacle to the "comprehensive federal" scheme for "removing aliens or adjudicating their status for that purpose," which the district court described as "structured, in part, to allow federal discretion and to permit in appropriate circumstances a legal adjustment in an alien's status," *id.* at 860-61.  The district court therefore granted summary judgment to the plaintiffs on their Supremacy Clause claim and permanently enjoined enforcement of the Ordinance.  *Id.* at 860-61.

After a panel of our court affirmed the district court judgment, *Villas at Parkside Partners v. City of Farmers Branch*, 675 F.3d 802 (5th Cir. 2012), the

Supreme Court issued its decision in *Arizona*, 132 S. Ct. 2492, which comprehensively set forth the reasons why federal law preempted various provisions of Arizona law relating to non-citizens.  That case concerned a Supremacy Clause challenge to various sections of an Arizona law known as S.B. 1070 that was enacted with the stated purpose of "'discourag[ing] and deter[ring] the unlawful entry and presence of aliens'" by "establish[ing] an official state policy of 'attrition through enforcement.'" *Arizona*, 132 S. Ct. at 2497; *cf. Arizona v. Inter Tribal Council of Arizona, Inc.*, No. 12-71, slip op. (U.S. June 17, 2013).  The Court's *Arizona* decision instructs our decision today.

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  The Court in *Arizona* reiterated that in the absence of an express preemption provision, a state or local law may be required to "give way to federal law" under at least two circumstances: field and conflict preemption.  *Arizona*, 132 S. Ct. at 2501.[3]  First, states and localities may not "regulat[e] conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance."  *Id.*  "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of

---

[3] "There is no doubt that Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision," *id.* at 2500-01, but here, the plaintiffs do not argue that the Ordinance is expressly preempted by any provision of federal law.

state laws on the same subject.'" *Id.* (alterations in original) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

Second, state and local laws are preempted "when they conflict with federal law." *Id.* "This includes cases where 'compliance with both federal and state regulations is a physical impossibility,' and those instances where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (citing *Hines*, 312 U.S. at 67). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Id.* (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)). In preemption analysis, we "assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Id.* (quoting *Rice*, 331 U.S. at 230).

## III.    Standard of Review

Generally, we review a district court's grant of a permanent injunction for abuse of discretion. *Peaches Enter. Corp. v. Enter. Repertoire Assocs., Inc.*, 62 F.3d 690, 693 (5th Cir. 1995). However, we review the "ultimate issue" in this case—the district court's grant of summary judgment on preemption grounds—*de novo*. *VRC LLC v. City of Dallas*, 460 F.3d 607, 611 (5th Cir. 2006); *Baker v. Farmers Elec. Coop., Inc.*, 34 F.3d 274, 278 (5th Cir. 1994).

## IV.    Conflict Preemption

We conclude that enforcement of the Ordinance conflicts with federal law. *See Arizona*, 132 S. Ct. at 2501. Conflict exists despite Farmers Branch's

argument that its Ordinance establishes "concurrent enforcement" of federal immigration law, as "[t]he fact of a common end hardly neutralizes conflicting means." *Crosby*, 530 U.S. at 379.  By setting forth criminal offenses that "discourage illegal immigration or otherwise reinforce federal immigration law," and by providing for state judicial review of a non-citizen's lawful or unlawful presence, the Ordinance creates such conflict.  Ordinance 2952 at §§ 1(C); 1(E); 3(C); 3(E); 5.

### A.     Criminal Offense Provisions

Applying *Arizona*, we hold that Farmers Branch's establishment of new criminal offenses based on the housing of non-citizens "disrupt[s] the federal [immigration] framework," *Arizona*, 132 S. Ct. at 2509, both by interfering with federal anti-harboring law and by allowing state officers to "hold[] aliens in custody for possible unlawful presence without federal direction and supervision." *Id.*; *cf. id.* at 2499 ("The dynamic nature of relations with other countries requires the Executive Branch to ensure that [immigration] enforcement policies are consistent with this Nation's foreign policy."); *see also Ga. Latino Alliance for Human Rights v. Georgia*, 691 F.3d 1250 (11th Cir. 2012), *reh'g en banc denied*, No. 11-13044 (11th Cir. Nov. 27, 2012); *United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012), *cert. denied*, 569 U.S. __ (2013) (No. 12-884).

### 1.     Offenses Applying to Landlords

Farmers Branch claims its Ordinance will concurrently enforce federal anti-harboring law by providing "a different mechanism against the same . . . conduct" criminalized by the federal government.  Ordinance 2952, pmbl.  As

the Supreme Court has cautioned, however, "conflict is imminent" when "two separate remedies are brought to bear on the same activity." *Crosby*, 530 U.S. at 380 (quoting *Wisconsin Dep't of Indus. v. Gould, Inc.*, 475 U.S. 282, 286 (1986)). Here, "examining the federal statute as a whole and identifying its purpose and intended effects," we conclude that the Ordinance stands as an obstacle to "the accomplishment and execution of the full purposes and objectives" of Congress. *See id.* at 373.[4]

It is a federal felony for any person, "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law," to "conceal[], harbor[], or shield[] from detection . . . such alien in any place, including any building." 8 U.S.C. § 1324(a)(1)(A)(iii). In enacting this provision, Congress "intended to broadly proscribe any knowing or willful conduct fairly within any of these terms that tends to substantially facilitate an alien's remaining in the United States illegally . . . ." *United States v. Rubio-Gonzalez*, 674 F.2d 1067, 1073 n.5 (5th Cir. 1982). To that end, we have interpreted the statutory phrase "harbor, shield, or conceal" to imply that "something is being hidden from detection." *United States v. Varkonyi*, 645

---

[4] The dissenting opinion's assertion that the Supreme Court rejected this analysis in *DeCanas,* confuses the field and conflict preemption inquiries. The Court in *DeCanas* noted that § 1324's then-*exemption* of employment from the definition of "harboring" was insufficient to conclude that Congress intended to occupy the field of non-citizen employment and therefore "to pre-empt all state regulation" in that area. 424 U.S. at 360 & n.9. While providing shelter *can*, by contrast, constitute harboring under § 1324, *see United States v. Cantu*, 557 F.2d 1173, 1180 (5th Cir. 1977), we conclude that the Ordinance is conflict preempted, without reaching field preemption. The Court in *DeCanas* explicitly based its decision on field preemption grounds and remanded the question of conflict preemption. *See id.* at 360 n.9 (noting that § 1324 and other "cited statutory provisions" would be "relevant on remand in the analysis of actual or potential conflicts between [the California provision] and federal law.").

F.2d 453, 459 (5th Cir. 1981).[5]

The Ordinance's criminal provisions, by contrast, do not require that a landlord know or recklessly disregard a renter's violation of federal law, nor that a landlord shield the renter's presence from detection, adjudication, and potential removal by the federal government. Ordinance 2952 at §§ 1(C)(7); 3(C)(7). Instead, the Ordinance criminalizes a landlord's mere renting of an apartment to a non-citizen found to be "not lawfully present in the United States." *Id.* at §§ 1(C)(7), 1(D)(4); 3(C)(7), 3(D)(4). "As a general rule, it is not a crime for a removable alien to remain present in the United States." *Arizona*, 132 S. Ct. at 2505. Persons who remain here while removable are not necessarily evading federal detection; in fact, federal law not only contemplates a non-citizen's residence in the United States until potential deportation, but also requires the non-citizen to provide a reliable address to the federal government to guarantee and speed the removal process. *See* 8 U.S.C. § 1229(a)(1)(F)(I) (during removal proceedings, written notice "shall be given in person to the alien . . . specifying . . . [t]he requirement that the alien must immediately provide (or have provided) the Attorney General with a written

---

[5] We have held that harboring requires making a non-citizen's illegal presence in the United States "substantially easier or less difficult." *United States v. Shum*, 496 F.3d 390, 392 (5th Cir. 2007); *see, e.g.*, *United States v. Hinojos-Mendez*, 270 F. App'x 368, 369 (5th Cir. 2008) (acting as a lookout at an apartment complex); *Shum*, 496 F.3d at 390 (providing false identifications and failing to file social security paperwork for employees); *United States v. Ramirez*, 250 F. App'x. 80, 83 (5th Cir. 2007) (barring officers from bedroom where illegal non-citizens were hiding, providing non-citizens with necessities including food and shelter, and attempting to prevent their being discovered by probation officers); *Varkonyi*, 645 F.2d at 453 (instructing immigrant employees to avoid detection, interfering with federal agents, and helping one non-citizen escape from custody); *Cantu*, 557 F.2d at 1180 (instructing employees to act like customers so they could evade arrest).

record of an address and telephone number (if any) at which the alien may be contacted."); *see also Arizona*, 132 S. Ct. at 2504.[6]    Farmers Branch's prohibition on renting to non-citizens here contrary to law thus not only fails to facilitate, but obstructs the goal of bringing potentially removable non-citizens to the attention of the federal authorities.[7]

Several additional features of 8 U.S.C. § 1324 further illustrate this conflict.[8] First, the federal government retains sole authority under the statute to prosecute, convict, and sentence offenders.  The statute grants state officers one role: to make arrests for violations of the proscribed federal crimes.   8 U.S.C. § 1324(c).  The Court in *Arizona* categorized this grant of authority under § 1324(c) as one of several "specific limited circumstances" in which federal law allows state officers to "perform the functions of an immigration officer . . . subject to the Attorney General's direction and supervision" under 8 U.S.C. § 1357(g)(3).  *Arizona*, 132 S. Ct. at 2506.   Second, to show that a federal criminal violation has occurred, "the prosecution must prove" in federal court "that the alien, who is transported or harbored by the defendant, 'has

---

[6] Of course, not every case will end in removal.  Discretion is built into our immigration system. *Arizona*, 132 S. Ct. at 2499 ("Discretion in the enforcement of immigration law embraces immediate human concerns . . . . Returning an alien to his own country may be deemed inappropriate even where he has committed a removable offense or fails to meet the criteria for admission.").

[7] *Cf. Whiting*, 131 S. Ct. at 1986 ("Congress's objective in authorizing the development of E-Verify was to ensure reliability in employment authorization verification, combat counterfeiting of identity documents, and protect employee privacy.  Arizona's requirement that employers operating within its borders use E-Verify in no way obstructs achieving those aims.").

[8] *See Arizona*, 132 S. Ct. at 2505 (A "[c]onflict in technique can be fully as disruptive to the system Congress enacted as a conflict in overt policy.") (internal quotation marks and citation omitted).

come to, entered, or remains in the United States in violation of the law,'" *United States v. Esparza*, 882 F.2d 143, 145 (5th Cir. 1989) (quoting *United States v. Rivera*, 859 F.2d 1204, 1209 (4th Cir. 1988)), using statutorily limited categories of *prima facie* evidence: "records of any judicial or administrative proceeding," "official records of the [USCIS] or of the Department of State," and "testimony by an immigration officer," 8 U.S.C. § 1324(b)(3); *cf. Arizona*, 132 S. Ct. at 2529 ("Arizona could also provide officers with a nonexclusive list containing forms of identification sufficient under § 2(B) to dispel any suspicion of unlawful presence.") (Alito, J., concurring in part and dissenting in part). We have held, for the purpose of proving the analogous crime of transporting certain non-citizens, that "[t]he aliens' status is an element of the crime." *United States v. Alvarado-Machado,* 867 F.2d 209, 212 (5th Cir. 1989). The "significant complexities involved in enforcing federal immigration law, including the determination whether a person is removable," *Arizona*, 132 S. Ct. at 2506, reinforce the importance of the federal government's supervisory role over the limited contexts, including harboring, where the Attorney General has delegated arrest authority to state officers. *Id.* We conclude that, by criminalizing conduct that does not have the effect of evading federal detection, and by giving state officials authority to act as immigration officers outside the "limited circumstances" specified by federal law, the Ordinance "interfere[s] with the careful balance struck by Congress" with respect to the harboring of non-citizens here contrary to law. *See Arizona*, 132 S. Ct. at 2505-06; *see also Crosby*, 530 U.S. at 367; *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*,

No. 12-13958, 2013 WL 1862714, at *12 (11th Cir. May 6, 2013).[9]

## 2.    Offenses Applying to Non-Citizen Renters

Another stated purpose of the Ordinance was to "aid in [the] enforcement" of the federal law providing—in the Ordinance's words—that "certain aliens not lawfully present in the United States are not eligible for certain State and local public benefits, including licenses." Ordinance 2952, pmbl. (citing 8 U.S.C. § 1621 *et seq.*) Farmers Branch criminalizes occupying an apartment or single-family residence without first obtaining a valid occupancy license. Ordinance 2952 §§ 1(C)(1); 3(C)(3); 5.[10] But unlike the

---

[9] Other courts also have found state anti-harboring provisions to be preempted by federal law. *See Ga. Latino Alliance for Human Rights v. Georgia*, 691 F.3d 1250, 1267 (11th Cir.) (holding that § 1324 preempted Georgia law criminalizing harboring of aliens), *reh'g en banc denied*, No. 11-13044 (11th Cir. Nov. 27, 2012); *United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012), *cert. denied* 569 U.S. __ (2013) (No. 12-884) (holding that § 1324 preempted Alabama law criminalizing concealing or harboring an unlawfully present alien and entering into a rental agreement with an unlawfully present alien); *Lozano v. City of Hazleton*, 620 F.3d 170, 223 (3d Cir.) (holding that § 1324 preempted a local ordinance prohibiting renting housing to illegal aliens), *cert. granted and vacated on other grounds*, 131 S. Ct. 2958 (2011); *United States v. South Carolina*, 906 F. Supp. 2d 463, 467-68 (D.S.C. 2012) (holding that § 1324 preempted South Carolina law creating state crimes for harboring, both relating to harborers and aliens themselves); *Valle del Sol v. Whiting*, No. 10-1061, 2012 WL 8021265 (D. Ariz. Sept. 5, 2012) (enjoining Arizona law creating state crimes for, *inter alia*, transporting and harboring aliens as preempted by § 1324). The Eleventh Circuit held, as we do here, that failing to limit harboring to activity facilitating evasion from federal authorities was an "untenable expansion of the federal harboring provision." *Alabama.* 691 F.3d at 1288. *But see Keller v. City of Fremont*, No. 12-1702 (8th Cir. June 28, 2013) (holding that a local ordinance prohibiting rental housing for illegal aliens was not field preempted and did not conflict with the federal removal process, and where the ordinance specified it did not prohibit conduct "expressly permitted by federal law," did not conflict with federal anti-harboring law).

[10] As previously noted, an occupancy license may be revoked only after the building inspector ascertains, after twice making inquiry to the federal government, that "the occupant is an alien who is not lawfully present in the United States." Ordinance 2952 at §§ 1(D)(2),(4); 3(D)(2),(4). The dissenting opinion asserts that after applying for and receiving an occupancy license, a renter is protected from criminal liability even if the license is revoked. The Ordinance makes it a criminal offense for a renter to "be an occupant of a [single family

criminal provisions of the employment laws upheld in *DeCanas* and *Whiting*, which applied only "to individuals whom the Federal Government has already declared cannot work in this country," *DeCanas*, 424 U.S. at 363; *see also Whiting*, 131 S. Ct. at 1981 (specifying that the Arizona law adopted the precise federal definition of "unauthorized alien" under 8 U.S.C. § 1324a(h)(3)), the Ordinance predicates arrests, detentions, and prosecutions based on a classification—the ability to obtain rental housing—that does not exist under § 1621 or anywhere else in federal law.[11]   *Cf. Plyler v. Doe*, 457 U.S. 202, 212 n.19 (1982) ("[I]f the federal government has by uniform rule prescribed what it believes to be appropriate standards for the treatment of an alien subclass, the States may, of course, follow the federal direction.").

Significantly, in remanding the conflict preemption inquiry to the state court, the Court in *DeCanas* noted California's concession that if its law reached aliens with employment authorization but without lawful status, it would be facially unconstitutional.  *DeCanas*, 424 U.S. at 364.  In this case, Farmers Branch's Ordinance reaches non-citizens who may not have lawful

---

residence or apartment] without first obtaining a valid occupancy license permitting the person to occupy that" residence.  Ordinance 2952 at §§ 1(C)(1); 3(C)(1).  The offense refers to an ongoing condition: "be[ing] an occupant" without first obtaining a valid license "permitting"—in the present tense—such occupancy.  *Id.*  A license is not valid after it is revoked, nor can it "permit[]" ongoing occupancy.  Even assuming, *arguendo*, that a license granted after the preliminary application is valid until revocation, the dissenting opinion's strained interpretation would require rewriting the offense's language to criminalize only *moving into* an apartment without first obtaining a valid license.

[11] Notably, also, the implementing regulations for Congress's E-Verify employment verification system allow employees to contest a finding, and forbid employers from taking adverse action against the employee while a final resolution is pending.  Pilot Programs for Employment Eligibility Confirmation, 62 Fed. Reg. 48,309, 48,312-13 (Sept. 15, 1997).

status but face no federal exclusion from rental housing, and exposes those non-citizens to arrests, detentions, and prosecutions based on Farmers Branch's assessment of "unlawful presence." The Ordinance not only criminalizes occupancy of a rented apartment or single-family residence, but puts local officials in the impermissible position of arresting and detaining persons based on their immigration status without federal direction and supervision. *See Arizona*, 132 S. Ct. at 2505.

Farmers Branch argues that the building inspector's "unlawful presence" inquiry is no different from those inquiries "made by hundreds of local governments daily to the federal government to ascertain immigrants' status and qualifications for benefits ranging from housing assistance to student loans to medical care and disability income." In those instances, however, the federal government has set out specific and carefully calibrated categories of non-citizens who qualify for such benefits. *See, e.g.*, 8 U.S.C. § 1641(b) (defining "qualified alien," for the purpose of conditioning federal, state, and local public benefits, as a member of one of seven enumerated classes, or "an alien who has been battered or subjected to extremely cruelty" by a household member); REAL ID Act, Pub. L. No. 109-13, 119 Stat. 231, § 202(c)(2)(B) (May 11, 2005) (conditioning the grant of state identification such as driver's licenses on an applicant's membership in one of eight enumerated classes of immigration status); 8 C.F.R. § 274a.12 (setting forth the specific "[c]lasses of aliens authorized to accept employment" pursuant to federal statutes and regulations); Definition of the Term Lawfully Present in the United States for Purposes of Applying for Title II Benefits Under Section 401(b)(2) of Public Law

10-10751

104-193, 61 Fed. Reg. 47,039 (Sept. 6, 1996) (defining a non-citizen "lawfully present" as falling under one of five particular immigration classifications, and providing that the definition of lawful presence "is made solely for the purpose of determining an alien's eligibility for payment of title II social security benefits . . . and is not intended to confer any immigration status or benefit under the Immigration and Nationality Act").

While federal law provides carefully calibrated definitions of the term "qualified alien" for the purpose of conferring benefits, the Ordinance does not specify which of many federal immigration classifications Farmers Branch officials would use to resolve whether a non-citizen was "lawfully present." The Ordinance's "generality stands at odds with the federal discreteness." *Crosby*, 530 U.S. at 379; *see also Odebrecht*, 2013 WL 1862714, at *11 (finding that a state law "squarely conflicts with the more nuanced federal regime" because "in stark contrast to the federal regime, [the state law] penalizes any [conduct]—no ifs, ands, or buts."). Indeed, because federal law does not limit the ability of non-citizens to obtain rental housing,[12] there is no definition that would be applicable to Farmers Branch's inquiry.[13]

---

[12] *Cf.* 8 U.S.C. § 1621(c)(1)(B) (limiting access to "public or assisted housing" for non-citizens who do not meet certain criteria).

[13] The dissenting opinion perceives an inconsistency with the harboring statute where none exists. Section 1324 obligates the federal government to prove that a non-citizen has "come to, entered, or remains in the United States in violation of law." 8 U.S.C. § 1324(a)(1)(A)(iii). Proving this violation beyond a reasonable doubt may require proof beyond a non-citizen's immigration status, such as records of an adjudicative proceeding or the testimony of an immigration officer. 8 U.S.C. § 1324(a)(1)(A)(iii). Contrary to the dissenting opinion's assertion, Farmers Branch cannot erect a concurrent criminal and state judicial enforcement regime based on an inquiry to administrative entities that provide only a renter's immigration status, not a conclusive determination of lawful or unlawful presence.

16

10-10751

While Farmers Branch officials testified that they intended to use the federal SAVE program to determine lawful presence, the chief of that program testified that SAVE can provide only a non-citizen's specific immigration status; it "does not answer lawful presence or not."[14]  Farmers Branch's building inspector testified that because an inquiry to the federal government would reveal only an applicant's immigration status, he himself would "have to make that determination [of whether the applicant is] lawfully present." Considering the labyrinth of statutes and regulations governing the classification of non-citizens, and the necessity for over 260 immigration judges to oversee individual cases, however, it is unsurprising that the building inspector also confusedly disclaimed that adjudicatory capacity, stating that: "[the decision of lawful presence] will rest with the people that give us the information that it may have told us what that status is."

Based on a classification that does not exist in federal law, Farmers Branch has criminalized the occupancy of rental housing by those non-citizens found to be "not lawfully present." Ordinance 2952 §§ 1(C)(1); 3(C)(3); 5. Texas law allows local officers to arrest and detain individuals for Class C misdemeanors. Texas Code Crim. Proc. art. 14.01; 14.06; 15.17.

The Supreme Court in *Arizona* invalidated a state law provision ("Section 6")  allowing state officers to "without a warrant . . . arrest a person if the

---

[14] *See also* Responsibility of Certain Entities to Notify the Immigration and Naturalization Service of Any Alien Who the Entity "Knows" Is Not Lawfully Present in the United States, 65 Fed. Reg. 58,301, 58, 302 (Sept. 28, 2000) ("A [SAVE] response showing no Service record on an individual or an immigration status making the individual ineligible for a benefit is not a finding of fact or conclusion of law that the individual is not lawfully present."). Similarly, the government states in its brief as amicus curiae that SAVE does not provide an independent, binary determination of an individual's "lawful presence."

17

officer has probable cause to believe . . . [the person] has committed any public offense that makes [him] removable from the United States." *Arizona*, 132 S. Ct. at 2505. The Court held that Section 6 "violates the principle that the removal process is entrusted to the federal government" by allowing state authorities to arrest and detain based on immigration status without prior federal "direction and supervision." *Id.* at 2506-07.  The Ordinance puts local officers in this impermissible position.

Indeed, Farmers Branch's Ordinance authorizes more interference with federal law than did the Arizona arrest-only authority invalidated by the Court. As dissenting Justices in *Arizona* emphasized, Section 6 allowed state officers to bring persons to the attention of federal authorities for further action, whereas the Ordinance allows for local authorities to prosecute as well as arrest based on perceived unlawful presence. *Cf. Arizona*, 132 S. Ct. at 2516 (noting that the Arizona statute authorized state arrests but contemplated "follow[ing] their [federal] lead on what to do next") (Scalia, J., concurring in part and dissenting in part); *id.* at 2517 (highlighting that "Arizona is entitled to arrest them and *at least* bring them to federal officials' attention, which is all that § 6 necessarily entails.  (In my view, the State can go further than this, and punish them for their unlawful entry and presence in Arizona.)") (Scalia, J., concurring in part and dissenting in part); *id.* at 2527 ("[T]he Federal Government retains the discretion that matters most–that is, the discretion to enforce the law in particular cases"; "the Federal Government decides, presumably based on its enforcement priorities, whether to have the person released or transferred to federal custody.") (Alito, J., concurring in part and

dissenting in part).

Although federal law does allow state officers to "cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States," 8 U.S.C. § 1357(g)(10)(B), the Supreme Court has held that "unilateral state action to detain" goes beyond any "coherent understanding of the term" "cooperation" under federal law. *Arizona*, 132 S. Ct. at 2507 (providing examples of "cooperation" as "participating in a joint task force with federal officers, providing operational support in executing a warrant, or allowing federal immigration officials to gain access to detainees held in state facilities."). The Ordinance conveys such unilateral state authority  to prosecute as well as to detain. Allowing state officers to arrest an individual whom they believe to be not lawfully present "would allow the State to achieve its own immigration policy" and could be "unnecessary harassment of some aliens . . . whom federal officials determine should not be removed." *Id.* at 2506.

The Ordinance is distinguishable from the section of the Arizona law upheld by the Court, which allows state officers to make a "reasonable attempt . . . to determine the immigration status of any person they stop, detain, or arrest on some other legitimate basis if reasonable suspicion exists that the person is an alien and is unlawfully present in the United States." *Id.* at 2507. The Court upheld that provision only after finding that the law, on its face, did *not* require officers to prolong detention for the purpose of conducting an immigration status check. *Id.* at 2509. Farmers Branch's Ordinance, by contrast, allows for arrests, detentions, and prosecutions predicated on an

19

occupant's failure to obtain a rental license, and the denial of such a license is in turn based on Farmers Branch's immigration status inquiry. *See* Ordinance 2952 at §§ 1(C); 3(C).[15]

The Supreme Court clarified that "it would disrupt the federal framework to put state offices in the position of holding aliens in custody for possible unlawful presence without federal direction and supervision." *Arizona*, 132 S. Ct. at 2509. Farmers Branch argues that the Ordinance relies entirely on the federal determination of lawful or unlawful presence. But even a determinative federal answer on this question—which, as explained above, would be impossible to obtain—would not bring the Ordinance's arrest procedures into compliance with federal law. "The federal statutory structure instructs when it is appropriate to arrest an alien during the removal process." *Id.* at 2505. Without a federal warrant, federal officers have even more limited

---

[15] The dissenting opinion states that prosecution of both renters and landlords under the Ordinance would rest on violation of licensing provisions, rather than the immigration status of the renter. This is a distinction without a difference. *See Odebrecht*, 2013 WL 1862714, at *13 (finding the state's "purported distinction" between punishing a false statement rather than the "conduct itself" to be "unpersuasive."). The Ordinance criminalizes "be[ing] an occupant of a leased or rented single family residence [or apartment] without first obtaining a valid occupancy license permitting the person to occupy that single family residence [or apartment," and "knowingly permit[ting] an occupant to occupy an apartment [or single family residence] without a valid residential occupancy license," Ordinance 2952 at §§ 1(C)(1), 1(C)(7); 3(C)(1), 3(C)(7). An occupancy license is revoked based on a finding of the occupant's unlawful presence. *Id.* at §§ 1(D)(4); 3(D)(4). This link is made doubly apparent by the fact that the Ordinance allows landlords and occupants to challenge a license revocation or a license deficiency notice by seeking judicial review of "the question of whether the occupant is lawfully present in the United States." *Id.* at §§ 1(E)(1), (3); 3(E)(1), (3). We note, also, that the Supreme Court has used the state arrest authority granted in § 1324(c) as a "limited circumstance[] in which state officers may perform the functions of an immigration officer" under federal supervision. *Arizona*, 132 S. Ct. at 2506. This is so because "[t]here are significant complexities involved in enforcing federal immigration law, including the determination whether a person is removable," that exist even where persons themselves are not prosecuted for removability *per se*. *Id.*

authority to arrest. *Id.* at 2506 (citing 8 U.S.C. § 1357(a)). The Ordinance's criminal provisions exist outside this statutory structure.[16]    For these reasons, we conclude that the Ordinance's criminal provisions, because they conflict with federal anti-harboring law and the federal authority to arrest and detain persons for possible unlawful presence, are preempted by federal law.

**B.    State Judicial Review**

The Ordinance also provides that "[a]ny landlord or occupant who has received a deficiency notice or a revocation notice may seek judicial review of the notice by filing suit against the building inspector in a court of competent jurisdiction in Dallas County, Texas." Ordinance 2952 at §§ 1(E)(1); 3(E)(1). A landlord or occupant may seek state judicial review of two questions: first, whether the building inspector complied with the law, and second, "whether the occupant is lawfully present in the United States." *Id.* at §§ 1(E)(3); 3(E)(3). In a suit over the latter question, the Ordinance indicates that "that question shall be determined under federal law" and "the [state] court shall be bound by any conclusive determination of immigration status by the federal government," with a "conclusive determination" defined as one which, under federal law, "would be given preclusive effect on the question." *Id.* at §§ 1(E)(4); 3(E)(4).

The federal government alone, however, has the power to classify non-citizens. *Arizona*, 132 S. Ct. at 2506; *DeCanas*, 424 U.S. at 354; 8 U.S.C. § 1229a(a)(3). Although, as with its criminal enforcement provisions, the

_____

[16] As the Court noted in *Arizona*, allowing state officers to make warrantless arrests would give those officers "even greater authority to arrest aliens on the basis of possible removability than Congress has given to trained federal immigration officers." 132 S. Ct. at 2506 (citing 8 U.S.C. § 1226(a), (c)(1)).

Ordinance indicates that the question of a non-citizen's lawful or unlawful presence shall be "determined under federal law," it nonetheless leaves the determination in the hands of state courts. Ordinance 2952 at §§ 1(E)(4); 3(E)(4). The Ordinance provides that a federal determination of a non-citizen's status binds the court only if it is "conclusive"—in other words, according to the Ordinance, only if, under federal law, it "would be given preclusive effect on the question" of whether an occupant is lawfully present under federal law. *Id.* But a non-citizen's immigration status, even in federal proceedings, may not conclusively determine lawful or unlawful presence.

Whereas the Supreme Court has made clear that there are "significant complexities involved in [making] . . . the determination whether a person is removable," and the decision is "entrusted to the discretion of the Federal Government," *Arizona*, 132 S. Ct. at 2506; *see also Plyler*, 457 U.S. at 236 (Blackmun, J., concurring) ("[T]he structure of the immigration statutes makes it impossible for the State to determine which aliens are entitled to residence, and which eventually will be deported."), the Ordinance allows state courts to assess the legality of a non-citizen's presence absent a "preclusive" federal determination, opening the door to conflicting state and federal rulings on the question.

The judicial review provision in this case is distinguishable from that upheld by the Supreme Court in *Whiting,* even though they both give the federal determination a rebuttable presumption of accuracy. *Whiting*, 131 S. Ct. at 1981 n.7; Ordinance 2952 at §§ 1(E)(5); 3(E)(5). Crucially, as the Supreme Court emphasized, the law in *Whiting* specified that "a state court may consider 'only' the federal determination," meaning that the state could

not "establish unlawful status apart from the federal determination." *Whiting*, 131 S. Ct. at 1981 n.7. The rebuttable presumption given to the federal determination in *Whiting*, as the Court noted, operated only to give "an employer a chance to show that it did not break the state law,"a narrow mechanism with no counterpart in Farmers Branch's Ordinance. 131 S. Ct. at 1981 n. 7. Here, the Ordinance does not similarly confine the state court to the federal determination, providing only that the state court must be bound by federal determinations having "preclusive effect." Ordinance 2952 at §§ 1(E)(4); 3(E)(4). Furthermore, the relevant determination in *Whiting* turned on a singular federal statutory definition: whether the alien has "the legal right or authorization under federal law to work in the United States as described in 8 U.S.C. § 1324a(h)(3)," Ariz. Rev. Stat. Ann. § 23-211 (2008). In turn, the statute defines such an alien as "lawfully admitted for permanent residence" or having received work authorization from the federal government. 8 U.S.C. § 1324a(h)(3). Those determinations do not involve the discretion and variability inherent in a determination of whether an alien is "lawfully present in the United States." *See* Ordinance 2952 at §§ 1(E)(4); 3(E)(4).

For these reasons, we hold that because the power to classify non-citizens is reserved exclusively to the federal government, the judicial review section of the Ordinance also is preempted by federal law. *See* 8 U.S.C. § 1229a(a)(3) (setting out the "sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States").[17]

---

[17] Because our conclusion is based on a finding of conflict preemption, we need not reach the question of field preemption. *Cf. Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, No. 12-13958, 2013 WL 1862714, at *17 n.7 (11th Cir. May 6, 2013) ("Because our conclusion that

## V.    Severability

Because the Ordinance lacks functional coherence without its criminal offense and penalty provisions, as well as without its overarching judicial review process, we decline to apply the general severability clause to revise and leave intact any remaining parts of the Ordinance. *See Rose v. Doctors Hosp.*, 801 S.W.2d 841, 844 (Tex. 1990)*; see generally Champlin Ref. Co. v. Corp. Comm'n*, 286 U.S. 210, 234-35 (1932); *Arizona*, 132 S. Ct. at 2505 (invalidating Arizona law seeking to achieve federal deterrence goal because of "a conflict in the method of enforcement").   This restraint is necessary because these elements, along with other interdependent requirements, notably that the Ordinance "shall be implemented in a manner fully consistent with federal law regulating immigration and protecting the civil rights of all citizens, nationals, and aliens," Ordinance 2952 at §§ 1(F); 3(F), as well as its explicit, prospective-only effective date tied to the instant federal constitutional litigation, *id.* at § 7, create provisions that "are connected in subject-matter, dependent on each other, operating together for the same purpose." *See Rose*, 801 S.W.2d at 844; *see also Nat'l Fed. of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 210 (5th Cir. 2011) (explaining that the severability of unconstitutional provisions of a state enactment is a question of state law).

The dissenting opinion describes the Ordinance as merely a "licensing-based regulatory program" and asserts that its "primary purpose is to effectuate licensing of apartment and single family rentals under the

---

the state Act conflicts with federal law is sufficient to affirm the judgment below, we decline to speak to field preemption as a separate issue, or to . . . . address[] the foreign affairs power or the dormant Foreign Commerce Clause.") (quoting *Crosby*, 530 U.S. at 379).

supervision of the building inspector." The idea that the Ordinance is primarily designed to promote a civil licensing scheme is contradicted not only by the Ordinance's criminal enforcement apparatus, *see supra*, but by the Ordinance's explicit reference to federal criminal anti-harboring law, Ordinance 2952, pmbl., by Farmers Branch's consistent emphasis on the Ordinance's "concurrent enforcement" of "federal criminal immigration law,"[18] and by City officials' blunt and exclusionary statements in the record. The City unhesitatingly has admitted, contrary to the dissenting opinion's characterization, that the Ordinance's purpose "is to prevent aliens not lawfully present in the United States from renting housing in the City of Farmers Branch" and to "discourag[e] such aliens from unlawfully remaining in the United States." As one City Council member testified, its "aim . . . was to try to make it more difficult for individuals who are in this country illegally to reside in Farmers Branch."

Furthermore, removing the Ordinance's criminal offense, judicial review, and penalty provisions[19] would leave only three substantive sections: licensing, immigration status verification, and enforcement. Unlike driver's licenses, which, as the dissenting opinion notes, promote "road safety and vehicle insurance," rental licenses—as the Ordinance's supporters themselves admit—do not confer any independent benefit. (As city council member Tim

---

[18] Farmers Branch's insistence that the Ordinance concurrently enforces federal criminal law—describing it before the district court as "clearly proscrib[ing] the same conduct [as § 1324], knowingly harboring an unauthorized alien in apartment building"; "a different mechanism against the same proscribed conduct . , , [as the] federal crime"; and "reinforc[ing] the federal criminal immigration law against harboring"—goes unmentioned by the dissent.

[19] The penalty provision applies only after a person is convicted under one of the Ordinance's enumerated criminal offenses. *Id.* at § 5.

Scott testified, "I don't think that there's a necessitated benefit from having a license . . . it's kind of benefit neutral."). Instead, their purpose in the Ordinance's scheme is limited to the consequences of their revocation based on a finding of unlawful presence. A verification of immigration status, however, as discussed above, does not necessarily determine lawful presence. And even assuming Farmers Branch could obtain such a determination, it would serve no purpose without the Ordinance's criminal and civil enforcement provisions. *See Rose*, 801 S.W.2d at 844 (severing unconstitutional portions of an Ordinance only where the remainder is "capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected."). That leaves the Ordinance's civil enforcement provision. The dissenting opinion asserts that Farmers Branch "hopes" that civil enforcement will prompt landlords and renters to "generally" comply with its provisions, and non-citizens to "make other housing choices." But the Ordinance's only civil enforcement mechanism—suspension of a landlord's license—is both premised on the landlord having committed an offense under §§ 1(C)(7) or 3(C)(7), *see* Ordinance 2952 at §§ 1(D)(5), (7); 3(D)(5), (7), and appealable only through the judicial review process that we hold to be preempted, *see id.* at §§ 1(E)(1); 3(E)(1).[20] Thus, we conclude that the Ordinance's provisions are so "essentially and inseparably connected in

---

[20] The dissenting opinion concludes that certain portions of the Ordinance's judicial review provisions are also severable. Even excising these portions, however, the Ordinance is left with the language that in "answering the question" whether "the occupant is lawfully present in the United States . . . the court shall be bound by any determination of immigration status by the federal government." Ordinance 2952 at §§ 1(E)(4); 3(E)(4). As set out above, however, a determination of immigration status from the federal government does not necessarily answer the question of lawful presence, and the Ordinance would leave state courts without remedy if immigration status did not conclusively answer the question.

substance" that, despite the presence of a severability clause, they are not severable under Texas law. *See Rose*, 801 S.W.2d at 844.

## VI.    Conclusion

Because the Ordinance's criminal offense and penalty provisions and its state judicial review process conflict with federal law, we AFFIRM the judgment of the district court.

10-10751

REAVLEY, Circuit Judge, joined by GRAVES, Circuit Judge, concurring only in the judgment:

Farmers Branch requires owners of residential property in the city to lease their property only to people who are lawfully present in the United States.[1] City officials explained that the problem was the Latino population and never mentioned any housing problem,[2] and the City contends that it may deny housing for illegal aliens whether or not they are removable from the country under the federal law. The City may think its ordinance serves the public welfare and is a legitimate exercise of its police power, and my colleagues apparently agree with this, but under Supreme Court holdings the national law of immigration and the control of foreign affairs preempts what Farmers Branch has done.

The Constitution unites the states to better serve the common good and protect revered rights. The Supreme Court in *Arizona v. United States*, 132 S. Ct. 2492 (2012), applied the Constitution as giving exclusive effect to national control of immigration and foreign affairs. Judges who approve any part of this ordinance evade that national authority. They do so by treating it as a mere housing regulation and by ignoring its purpose and effect: the exclusion of Latinos from the city of Farmers Branch. The record leaves no

---

[1] The dissent suggests that the City's issuance of an occupancy license is non-discretionary insofar as the license is "automatically" issued and there is no affirmative obligation to declare one's lawful presence in the United States before receiving the license. This view mischaracterizes the operation of the City's regulation and its onerous results. The Ordinance demands that failure to declare *either* United States citizenship or a federal number that establishes "lawful presence" will trigger a process more likely than not leading the building inspector to revoke the license. *See, e.g.*, FARMERS BRANCH, TEX., ORDINANCE 2952 § 1(B) & (D).

[2] See the panel opinion: 675 3d 802, 805-06, 809–10 (5th Cir. 2012).

doubt of this.

Preliminarily, I question whether this ordinance qualifies to be called an exercise of police power, because it cannot be said "to promote the safety, peace, public health, convenience and good order of its people."[3] *City of Birmingham v. Monk*, 185 F.2d 859, 861–62 (5th Cir. 1950). But the police power is not above the Constitution. *Id.*; *see also Ga. Alliance for Human Rights v. Governor of Ga.*, 691 F.3d 1250, 1265 n.11 (11th Cir. 2012) ("[L]egislation in a field where states traditionally have power does not defeat a claim of federal preemption."). The Court has often stated that a state law is preempted by the Supremacy Clause where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 132 S. Ct. at 2501; *Hines v. Davidowitz*, 312 U.S. 52, 67–68, 61 S. Ct. 399 (1941).

Whether the Farmers Branch ordinance is preempted as an obstacle to the purposes and objectives of Congress in the field of immigration is a "matter of judgment" informed by the federal scheme and the purpose and effects of the federal statute as a whole. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373, 120 S. Ct. 2288, 2294 (2000). We must therefore consider Congress's

---

[3] As noted in the panel opinion:

[T]he City points to nothing showing an effect on public welfare by illegal aliens' occupancy of rental housing. The mayor of Farmers Branch confirmed that the City conducted no studies on the effects of undocumented aliens on the value of property in Farmers Branch, the quality of its schools, the crime rate, or the availability of healthcare to its residents. One City Council member, Gary Greer, testified that there was no data showing whether undocumented immigrants commit more crimes than others in Farmers Branch. Still another council member, David Koch, agreed that the Ordinance was "not directed in any way towards revitalization" but rather was "directed solely towards removing illegal immigrants."

675 F.3d at 810.

objectives in the Immigration and Nationality Act (INA), where the "[f]ederal governance of immigration and alien status is extensive and complex." *Arizona*, 132 S. Ct. at 2499; *see also Chamber of Commerce of U.S. v. Whiting*, 131 S. Ct. 1968, 1973 (2011) (stating that with the INA Congress "established a comprehensive federal statutory scheme for regulation of immigration and naturalization and set the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country" (internal quotation marks and citation omitted)). Congress has extensively determined which aliens may be admitted to this country, which aliens should be removed, and the process for both admission and removal. *Arizona*, 132 S. Ct. at 2499.

For example, the INA creates multiple categories of aliens subject to removal, and it provides for the expedited removal of certain aliens. 8 U.S.C. §§ 1227–28. It also expressly grants discretion for the Attorney General to waive removal under certain circumstances, such as for humanitarian purposes or for victims of domestic abuse. *See*, *e.g.*, *id.* § 1227(a)(1)(E)(iii) & (a)(7). It further sets out the procedures for adjudicating an alien's status before an immigration judge, and it specifies that those procedures are the exclusive means for determining the removability of an alien. *Id.* § 1229a(a)(3). Moreover, the federal scheme contains various provisions under which aliens who have come to the United States unlawfully may be permitted to remain here, including asylum, *id.* § 1158, cancellation of removal, *id.* § 1229b, withholding of removal, *id.* § 1231(b)(3), and temporary protected status, *id.* § 1254a. In light of this comprehensive statutory framework, "the removal process is entrusted to the discretion of the Federal Government." *Arizona*, 132 S. Ct. at 2506; *see also Galvan v. Press*, 347 U.S. 522, 531, 74 S. Ct. 737, 743

(1954) ("Policies pertaining to the entry of aliens and their right to remain here are . . . entrusted exclusively to Congress[.]").  When set against the extensive federal scheme and its discretionary allowances, the Farmers Branch ordinance interferes with Congress's objectives and regulation of immigration.  *See id.* at 2506–07.

First, the premise of the ordinance, as argued in the City's brief, is that any non-citizen "unlawfully" present in Farmers Branch has no legal right to be present anywhere in the United States, and therefore the ordinance may criminalize the continued presence of such persons within rental housing in the City.  The premise is a false one, however, because "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States." *Arizona*, 132 S. Ct. at 2505.  For this reason, the Court held that Arizona could not authorize the arrest of persons thought probably to be illegal aliens because the state may not regulate the presence of removable aliens.

Second, the ordinance does more than merely deter the presence of Latinos from Farmers Branch, and instead works to exclude and remove aliens from the City's borders.  This is because no alien with an unlawful status will be able to obtain the basic need of shelter through a rental contract.  Illegal aliens will therefore have no recourse but to self-deport from Farmers Branch. *See Lozano v. City of Hazleton*, 620 F.3d 170, 220–21 (3d Cir. 2010) ("It is difficult to conceive of a more effective method of ensuring that persons do not enter or remain in a locality than by precluding their ability to live in it." (internal quotation marks and citation omitted)), *vacated on other grounds by* __ U.S. __, 131 S. Ct. 2958 (2011).  This forced migration of illegal aliens conflicts with the careful scheme created by the INA and burdens the national

prerogative to decide which aliens may live in this country and which illegal aliens should be removed.

It is said that the ordinance is permissible as regulation of employment was permissible in *DeCanas v. Bica*, 424 U.S. 351, 96 S. Ct. 933 (1976). But neither my position nor that of the Supreme Court conflict with *DeCanas*. The California statute there was directed at an acute economic problem that left many citizens unemployed. The Court held that the state's police power justified the legal priority for their employment to go ahead of people unlawfully present. The police power is not so clear here, and the immigration conflict did not exist there.

The Eleventh Circuit reached a similar conclusion when it recently considered a provision of an Alabama law that prohibited the recognition of contracts entered into by unlawful aliens. *United States v. Alabama*, 691 F.3d 1269, 1292–95 (11th Cir. 2012), *cert. denied*, 133 S. Ct. 2022 (Apr. 29, 2013). Because the law essentially prevented aliens "from enforcing contracts for basic necessities" in derogation of the ability to live and conduct daily affairs, the court concluded that the measure's effect of forcing undocumented aliens out of the state interfered with the exclusive federal power to expel aliens, as well as with the INA's comprehensive scheme governing the removal of aliens. *Id.* at 1293–94. The Farmers Branch ordinance is just as invidious because its adverse effect on housing also precludes aliens from obtaining an essential human requirement. *Cf. id.* at 1299 n.25 (recognizing that depriving aliens of "basic needs, such as water, garbage, and sewer services . . . amounted to an impermissible policy of expulsion"). Farmers Branch, like Alabama, "has essentially decided that unlawfully present aliens cannot be tolerated within

10-10751

its territory, without regard for any of the statutory processes or avenues for granting an alien permission to remain lawfully within the country."[4] *Id.* at 1295.

By effectively removing illegal immigrants from the City, Farmers Branch also interferes with the national power to control and conduct relations with foreign nations. This concern about the relationship between immigration and foreign affairs, and the exclusivity of the national power, often has been stated by the Supreme Court. *See*, *e.g.*, *Arizona*, 132 S. Ct. at 2498–99; *see also Toll v. Moreno*, 458 U.S. 1, 10, 102 S. Ct. 2977, 2982 (1982) (noting that federal authority over "the status of aliens derives from multiple constitutional sources, including the Federal Government's power '[t]o establish [a] uniform Rule of Naturalization,' . . . its power '[t]o regulate Commerce with foreign Nations,' . . . and its broad authority over foreign affairs" (alterations in original) (citations omitted)); *Plyler v. Doe*, 457 U.S. 202, 219 n.19, 102 S. Ct. 2382, 2396 n.19 (1982) ("With respect to the actions of the Federal Government, alienage classifications may be intimately related to the conduct of foreign policy, to the federal prerogative to control access to the United States, and to the plenary federal power to determine who has sufficiently manifested his allegiance to become a citizen of the Nation. No State may independently exercise a like power."); *id.* at 237 n.1, 102 S. Ct. at 2405 n.1 (Powell, J.,

---

[4] The dissent concludes that the Ordinance does not "effect or affect" aliens' removal. This view is similar to that of two judges on the Eighth Circuit, *see Keller v. City of Fremont*, __ F.3d __, 2013 WL 3242111, at *5 (8th Cir. June. 28 2013), but it is contrary to the conclusion reached by both the Third Circuit in *Lozano* and the Eleventh Circuit in *Alabama* when considering similar laws, and it is blind to the reality of what this ordinance does. As noted by Judge Bright in *Keller*, there can be no doubt that "[t]he purpose and effect of the . . . ordinance is exclusion and removal of undocumented persons." *Keller*, 2013 WL 3242111, at *22 (Bright, J., dissenting).

33

concurring) ("Given that the States' power to regulate in this area is so limited, and that this is an area of such peculiarly strong federal authority, the necessity of federal leadership seems evident."); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–589, 72 S. Ct. 512, 519 (1952) ("It is pertinent to observe that any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."); *Hines*, 312 U.S. at 64, 61 S. Ct. at 402; *Chy Lung v. Freeman*, 92 U.S. 275, 279 (1875) ("If th[e] government [of California] should get into a difficulty [because of its treatment of noncitizens] which would lead to war, or to suspension of intercourse, would California alone suffer, or all the Union?").

The *Arizona* opinion opens by emphasizing the "broad, undoubted" federal power "over the subject of immigration and the status of aliens," and the "inherent power as sovereign to control and conduct relations with foreign nations." *Arizona*, 132 S. Ct. at 2498. The Court gives a full description of the importance of how this nation treats the nationals of foreign countries when they are in this country because "perceived mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad." *Id.*; *see also Hines*, 312 U.S. at 64, 61 S. Ct. at 402 ("One of the most important and delicate of all international relationships . . . has to do with the protection of the just rights of a country's own nationals when those nationals are in another country."). In light of the potential ramifications of the treatment of aliens in this country, "Congress," not the states, "specifie[s] which

aliens may be removed from the United States and the procedures for doing so." *Arizona,* 132 S. Ct. at 2499. Of paramount importance to the federal scheme "is the broad discretion exercised by immigration officials" because "aliens may seek asylum and other discretionary relief allowing them to remain in the country or at least to leave without formal removal." *Id.* The discretionary decision on removal involves many factors, including the "equities of an individual case . . . , including whether the alien has children born in the United States, long ties to the community, or a record of distinguished military service," as well as "policy choices that bear on this Nation's international relations." *Id.* Therefore, "[t]he dynamic nature of relations with other countries requires the Executive Branch," not the states, "to ensure that enforcement policies are consistent with this nation's foreign policy with respect to these and other realities." *Id.*

The Court wrote this as a crucial part of its formal legal analysis, but it is ignored by the dissenters. The Court went on later to address the federal government's discretion over the removal process as "embracing immediate human concerns" that will affect whether an alien should be permitted to remain in this country. *Id.*

"Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime." *Id.* Other "discretionary decisions involve policy choices that bear on this Nation's international relations," including whether to return an alien to a foreign state "mired in civil war, complicit in political persecution, or enduring conditions that create a real risk that the alien or his family will be harmed upon return." *Id.* Given the complexity and the myriad factors that

10-10751

go into the removal decision, it is clear that "foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." *Id.* at 2498.

Farmers Branch expressly singled out those aliens who cannot show or honestly state their lawful residence, and imposed a burden on landlords and realtors that can be avoided by them simply choosing not to deal with Latino people when they have an alternative. This ordinance is surely offensive to immigrants and to our neighbors to the south. My colleagues are completely silent about this.

Congress's framework for removal provided in the INA and the discretion allowed by that framework show that Congress has occupied the field of alien removal. The Farmers Branch ordinance ignores the practical reality of the federal government's control of the removal process, however, and simply requires illegal immigrants to remove themselves from the city's borders. But "[a] decision on removability requires a determination whether it is appropriate to allow a foreign national to continue living in the United States. Decisions of this nature touch on foreign relations and *must* be made with one voice." *Id.* at 2506–07 (emphasis added).

The Farmers Branch ordinance is but one example of a trend in this country of states and localities attempting to take immigration matters into their own hands. This trend to single out illegal immigrants for adverse treatment is reminiscent of the "anti-Japanese fever" that existed in the 1940s. *See Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 422, 68 S. Ct. 1138, 1144 (1948) (Murphy, J., concurring). As so powerfully articulated in Justice

36

10-10751

Murphy's concurrence in *Takahashi*, "[l]egislation of that type is not entitled to wear the cloak of constitutionality." *Id.*

With the support now of the Supreme Court in the *Arizona* decision, as well as the Eleventh Circuit in *Alabama*, I repeat what the panel said about the Farmers Branch ordinance:  Because the sole purpose and effect of this ordinance is to target the presence of illegal aliens within the city of Farmers Branch and to cause their removal, it contravenes the federal government's exclusive authority on the regulation of immigration and the conditions of residence in this country, and it constitutes an obstacle to federal authority over immigration and the conduct of foreign affairs.

10-10751

DENNIS, Circuit Judge, joined by REAVLEY, PRADO, and GRAVES, Circuit Judges, specially concurring:

I concur in affirming the district court's judgment permanently enjoining Farmers Branch Ordinance 2592 because federal law preempts and renders it invalid. Although I agree with many of the reasons Judge Higginson assigns in the lead opinion for reaching the same result, I believe the Ordinance is even more fundamentally flawed than he indicates.[1] In my view, the Ordinance is preempted in all of its core provisions by the comprehensive and interrelated federal legislative schemes governing the classification of noncitizens, the adjudication of immigration status, and the exclusion and deportation of noncitizens from the United States, enacted pursuant to the federal government's constitutional authority to administer a uniform national immigration policy.[2]

---

[1] The lead opinion concludes first that the Ordinance's criminal offense and judicial review provisions conflict with the mechanisms and purposes of federal immigration law in various respects; and then that the remaining provisions of the Ordinance are not severable from the unconstitutional provisions under applicable principles of Texas law. In my view, the Ordinance's fundamental defects — its classification of noncitizens based on the concept of "lawful presence" and its purported regulation of the residence and presence of noncitizens based on that classification — are intrinsic to the Ordinance's structure and run throughout its various provisions, making a severability analysis unnecessary. In any event, however, the City has forfeited and waived any argument as to the applicability or effect of the Ordinance's severability clause by declining to argue the issue below, *see Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 595 (5th Cir. 2007) ("[T]o preserve an argument for appeal, [a] litigant must press [it] . . . before the district court."), to the original panel, *see Sama v. Hannigan*, 669 F.3d 585, 589 n.5 (5th Cir. 2012) ("[I]ssues not briefed on appeal are waived."), or even in its en banc petition or brief, *see United States v. Hernandez-Gonzalez*, 405 F.3d 260, 262 (5th Cir. 2005) ("Absent extraordinary circumstances, this court will not consider issues raised for the first time in a petition for rehearing.").

[2] I also agree with many of the reasons assigned by Judge Reavley in his separate opinion concurring in the judgment.

# I

In *Arizona v. United States*, 132 S. Ct. 2492 (2012), the Supreme Court reiterated the familiar maxims that a state or local law is preempted under the Supremacy Clause not only where Congress enacts "an express preemption provision" but also where congressional "intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it,'" *id.* at 2501 (alteration in original) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)), or "where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" *id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).  I believe the *Hines* Court's earlier discussion of the overlap and interplay of these related formulations continues to provide useful guidance as to the ultimate practical inquiry under implied preemption doctrine:

> There is not — and from the very nature of the problem there cannot be — any rigid formula or rule which can be used as a universal pattern to determine the meaning and purpose of every act of Congress.  This Court, in considering the validity of state laws in the light of treaties or federal laws touching the same subject, has made use of the following expressions: conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference.  But none of these expressions provides an infallible constitutional test or an exclusive constitutional yardstick.  In the final analysis, there can be no one crystal clear distinctly marked

formula.  Our primary function is to determine whether, under the circumstances of [a] particular case, [the challenged state or local] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*Hines*, 312 U.S. at 67-68.  Like my colleagues who join the lead opinion, as well as the original panel and the district court below, I conclude that the Farmers Branch Ordinance  presents such an obstacle to the purposes of federal law, and therefore cannot stand.

## II

In my view, this case largely is controlled by the longstanding, unremarkable principle that the federal government's authority to exclude or remove foreign nationals, and to otherwise regulate the residence of noncitizens within the United States, is necessarily exclusive of infringement by state or local legislation.  The Supreme Court made this clear more than sixty years ago:

The Federal Government has broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization. *Hines*[,] [312 U.S. at 66].  Under the Constitution the states are granted no such powers; they can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United

States or the several states.

*Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948).

This past year, in *Arizona*, the Supreme Court reaffirmed that "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 132 S. Ct. at 2498 (citing *Toll v. Moreno*, 458 U.S. 1, 10 (1982)). "This authority rests, in part, on the National Government's constitutional power to 'establish an uniform Rule of Naturalization,' U.S. Const., Art. I, § 8, cl. 4, and its inherent power as sovereign to control and conduct relations with foreign nations." *Id.* "Federal law makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders," *id.* at 2502, and "[p]olicies pertaining to the entry of aliens and their right to remain here are [likewise] entrusted exclusively to Congress," *id.* at 2507 (quoting *Galvan v. Press*, 347 U.S. 522, 531 (1954)).

In exercise of this exclusively national authority, "[f]ederal governance of immigration and alien status is extensive and complex." *Id.* at 2499. Of particular relevance here, "Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Id.* "A principal feature of the removal system" Congress has enacted "is the broad discretion exercised by immigration officials." *Id.* For instance, in "the initiation or prosecution of various stages in the deportation process[,] . . . the Executive has discretion to abandon the endeavor, and . . . [the Executive has] engag[ed] in a regular practice (which ha[s] come to be known as 'deferred action') of exercising that discretion for humanitarian reasons or simply for its

own convenience." *Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 484-85 (1999).[3] The Court made clear in *Arizona* that a state or local law that "violates the principle that the removal process is entrusted to the discretion of the Federal Government" cannot stand.  132 S. Ct. at 2506 (citing *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 483-84).

Most pertinent to the present case, the *Arizona* Court concluded that this comprehensive federal legislative scheme, and the significant discretion it vests in federal immigration authorities, necessarily preempted Arizona legislation that would have allowed "a state officer, 'without a warrant, [to] arrest a person if the officer has probable cause to believe . . . [the person] has committed any public offense that makes [him] removable from the United States." *Id.* at 2505 (final three alterations in original).  The Court held that the statute stood as an impermissible obstacle to the design and purposes of the largely discretionary immigration enforcement system Congress created because it could result in "unnecessary harassment of some aliens (for instance, a veteran, college student, or someone assisting with a criminal investigation) whom federal officials determine should not be removed" and ultimately "would allow the State to achieve its own immigration policy." *Id.* at 2506.  Because such

---

[3] In a notable recent exercise of this prosecutorial discretion, in June 2012 "the Secretary of Homeland Security announced a program" whereby "U.S. immigration officials have been directed to 'defe[r] action'" as to "some 1.4 million [noncitizen students, high school graduates, veterans, and others] under the age of 30 . . . who came to the United States under the age of sixteen" without authorization and meet certain other criteria. *Arizona*, 132 S. Ct. at 2521 (Scalia, J., dissenting) (first alteration in original) (quoting Memorandum from Janet Napolitano, Sec'y of Homeland Security, to David V. Aguilar, Acting Comm'r, U.S. Customs & Border Protection; Alejandro Mayorkas, Dir., U.S. Citizenship & Imm. Servs.; and John Morton, Dir., U.S. Imm. & Customs Enforcement, at 1 (June 15, 2012), and citing Julia Preston & John H. Cushman, Jr., Obama to Permit Young Migrants to Remain in U.S., N.Y. Times, June 16, 2012, at A1).

state-to-state variance "is not the system Congress created," the Court held that the Arizona statute "violates the principle that the removal process is entrusted to the discretion of the Federal Government." *Id.*

The Farmers Branch Ordinance likewise "violates the principle that the removal process is entrusted to the discretion of the Federal Government," *see id.*, by criminalizing the rental of residential property to certain noncitizens and thereby in effect commencing the process of excluding them from a part of "the United States or the several states," *see Takahashi*, 334 U.S. at 419; *cf. Arizona*, 132 S. Ct. at 2521 (Scalia, J., dissenting) (complaining that the federal government's discretionary "enforce[ment] [of] immigration laws . . . leaves *the States' borders* unprotected against immigrants whom those laws would exclude" (emphasis added)). Moreover, noncitizen renters "could be unnecessar[ily] harass[ed]" and prosecuted under a law like that here, including individuals "whom federal officials determine should not be removed." *See Arizona*, 132 S. Ct. at 2506. Underscoring the Ordinance's fundamental inconsistency with the federal system, federal law specifically requires a noncitizen subjected to removal proceedings to provide federal authorities "with a written record of an address . . . at which the alien may be contacted respecting [the] proceeding." 8 U.S.C. § 1229(a)(1)(F)(i); *cf. Arizona*, 132 S. Ct. at 2505 ("As a general rule, it is not a crime for a removable alien to remain present in the United States.").

The City argues that the Ordinance is consistent with federal immigration law because under the classification and enforcement system envisioned by the Ordinance, City officials making determinations of "lawful presence" are to rely on federal agents' responses to queries submitted

pursuant to 8 U.S.C. § 1373(c), which directs federal immigration authorities to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law." However, the Ordinance's enforcement scheme turns on determinations of whether a noncitizen tenant is or is not "lawfully present in the United States," a blunt binary classification that is inconsistent with the extensive array of immigration statuses provided under federal law and with the complex, often discretionary processes by which the federal government enforces and adjudicates immigration law. *See Arizona*, 132 S. Ct. at 2499 ("Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all. If removal proceedings commence, aliens may seek asylum and other discretionary relief allowing them to remain in the country or at least to leave without formal removal." (citations omitted)); *id.* at 2506 ("There are significant complexities involved in enforcing federal immigration law, including the determination whether a person is removable.").

In holding that state or local laws that effectively exclude certain noncitizens are inconsistent with the federal government's exclusive authority to define and determine immigration status and regulate the presence of foreign nationals, the decision this court reaches today accords with the Eleventh Circuit's post-*Arizona* decision in *United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012), *cert. denied*, 133 S. Ct. 2022, 2013 WL 210698 (Apr. 29, 2013), which preempted an Alabama statute similar in effect to the Farmers Branch Ordinance. The Alabama law purported to "prohibit[] courts from enforcing or recognizing contracts between a party and an unlawfully present

10-10751

alien," including contracts for rental housing. *Id.* at 1292-93.  Noting that "[t]he power to expel aliens has long been recognized as an exclusively federal power," *id.* at 1293, the Eleventh Circuit held that the Alabama legislation "conflicts with Congress's comprehensive statutory framework governing alien removal," *id.* at 1294.  Much as with the instant Ordinance, in that case, "Alabama ha[d] taken it upon itself to unilaterally determine that any alien unlawfully present in the United States cannot live within the state's territory, regardless of whether the Executive Branch would exercise its discretion to permit the alien's presence."  *Id.* at 1295.  As the Eleventh Circuit rightly concluded, "[t]his is not a decision for [a state or city] to make."  *See id.*[4]

### III

In many contexts, of course, our federalist system permits states to "try novel social and economic experiments without risk to the rest of the country." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting).  The supremacy of federal law, however, is fundamental to this federalism.  *Wyeth v. Levine*, 555 U.S. 555, 584 (2009).  *Arizona* and other preemption cases teach that the Supremacy Clause will not abide local divergence from necessarily uniform national laws and policies adopted pursuant to the federal government's constitutional powers.  *Arizona*, 132 S. Ct.

---

[4] Courts considering similar enactments prior to *Arizona* likewise held them unconstitutional.  *See Lozano v. City of Hazleton*, 620 F.3d 170, 221 (3d Cir. 2010) (holding preempted municipal housing ordinance that would "effectively 'remove' persons from [the city] based on a snapshot of their current immigration status, rather than based on a federal order of removal"), *vacated on other grounds*, 131 S. Ct. 2958 (2011); *Cent. Ala. Fair Housing Ctr. v. Magee*, 835 F. Supp. 2d 1165, 1183 (M.D. Ala. 2011) (enjoining enforcement of since-amended Alabama law prohibiting "unlawfully present" residents from obtaining or renewing manufactured home permits because the law "runs afoul of federal policy" by "making an impermissible leap from undocumented status to removal").

at 2502 ("If § 3 of the Arizona statute were valid, every State could give itself independent authority to prosecute federal registration violations, diminish[ing] the [Federal Government]'s control over enforcement and detract[ing] from the integrated scheme of regulation created by Congress." (alterations in original) (internal quotation marks omitted) (quoting *Wis. Dep't of Indus. v. Gould Inc.*, 475 U.S. 282, 288-89 (1986))); *see Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 161-63 (1989) ("The prospect of all 50 States establishing similar protections for preferred industries without the rigorous requirements of patentability prescribed by Congress could pose a substantial threat to the patent system's ability to accomplish its mission of promoting progress in the useful arts. . . . One of the fundamental purposes behind the Patent and Copyright Clauses of the Constitution was to promote national uniformity in the realm of intellectual property. . . . Absent [a uniform] federal rule, each State could afford patent-like protection to particularly favored home industries, effectively insulating them from competition from outside the State."); *Wis. Dep't of Indus.*, 475 U.S. at 288-289 ("[I]f Wisconsin's [law debarring certain repeat violators of the National Labor Relations Act (NLRA)] from doing business with the State is valid, nothing prevents other States from taking similar action against labor law violators. Indeed, at least four other States already have passed legislation disqualifying repeat or continuing offenders of the NLRA from competing for state contracts. Each additional statute incrementally diminishes the [National Labor Relations] Board's control over enforcement of the NLRA and thus further detracts from the 'integrated scheme of regulation' created by Congress." (footnote omitted)).

Uniformity of national law and policy are essential to this nation's

classification and treatment of the citizens of other nations. *See Arizona*, 132 S. Ct. at 2498 ("The [Federal] Government['s] . . . broad, undoubted power over the subject of immigration and the status of aliens[] . . . rests, in part, on the National Government's constitutional power to 'establish an uniform Rule of Naturalization,' and its inherent power as sovereign to control and conduct relations with foreign nations. . . . Immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws." (citations omitted)); *see also, e.g.*, *Renteria-Gonzalez v. INS*, 322 F.3d 804, 814 (5th Cir. 2002) (emphasizing the importance of "uniformity of federal law and consistency in enforcement of the immigration laws"). As the *Arizona* Court explained, "[a] decision on removability requires a determination whether it is appropriate to allow a foreign national to continue living in the United States. Decisions of this nature touch on foreign relations and *must be made with one voice*." 132 S. Ct. at 2506-07 (emphasis added); *see also id.* at 2507 ("Removal decisions[] . . . implicate [the Nation's] relations with foreign powers and require consideration of changing political and economic circumstances." (third alteration in original) (quoting *Jama v. Imm. & Customs Enforcement*, 543 U.S. 335, 348 (2005))); *Renteria-Gonzalez*, 322 F.3d at 814 ("[T]he executive branch[] . . . 'must exercise especially sensitive political functions that implicate foreign relations.'" (quoting *INS v. Abudu*, 485 U.S. 94, 110 (1988))).

Accordingly, perhaps more than in any other context, "[t]he prospect of all 50 States establishing" laws similar to Farmers Branch's Ordinance "could pose a substantial threat to th[e]" uniform federal immigration "system's

ability to accomplish" its various competing and highly sensitive functions. *See Bonito Boats, Inc.*, 489 U.S. at 161. If the Ordinance "were valid, every State could give itself independent authority to" regulate the presence of noncitizens, "diminishing the Federal Government's control over [immigration] enforcement and detracting from the integrated scheme of regulation created by Congress." *See Arizona*, 132 S. Ct. at 2502 (brackets and internal quotation marks omitted). If this law were constitutional, all cities and states could by similar laws seek to withdraw rental housing from vast numbers of noncitizens and, in effect, accomplish their removal from the United States. Much more likely, and equally problematic, is the prospect of a patchwork of "[s]tate . . . immigration polic[ies]," *Arizona*, 132 S. Ct. at 2506, with some states imposing additional burdens on certain noncitizens based on the states' own classification and enforcement schemes, *see, e.g.*, *Alabama*, 691 F.3d at 1292-97. Such an arrangement would be plainly incompatible with the "comprehensive and unified system" of exclusive federal immigration regulations, *see Arizona*, 132 S. Ct. at 2502, and with "the limitations imposed by the Supremacy Clause," *Wyeth*, 555 U.S. at 584.

Because the nation must necessarily speak "with one voice" when pronouncing "whether it is appropriate to allow a foreign national to continue living in the United States," the Supremacy Clause does not abide local experimentation that deviates from "the system Congress created." *Arizona*, 132 S. Ct. at 2506-07.

## IV

In sum, I conclude that the Ordinance infringes on and conflicts with comprehensive and exclusively federal schemes for classifying noncitizens and

10-10751

with enforcing and adjudicating the implications of those federal classifications. It thus stands as an obstacle to the full achievement of the purposes and objectives of uniform federal immigration law. Therefore, I agree that the Ordinance is preempted under the Supremacy Clause.

No. 10-10751

OWEN, Circuit Judge, concurring and dissenting.

I would hold that only two narrow provisions of the Ordinance[1] are preempted by federal law. They are within the judicial review sections of the Ordinance.[2] One subsection, (E)(4), and one sentence in subsection (E)(5) are in conflict with federal immigration law. I would sever these provisions and hold that the remainder of the Ordinance is not preempted by federal law.

# I

I agree with the dissenting opinion authored by JUDGES JONES and ELROD that the Ordinance is not preempted by the Constitution's broad grant to the federal government of the power to regulate immigration.[3] The Ordinance does not determine "who should or should not be admitted into the country" or "the conditions under which a legal entrant my remain."[4] As the Supreme Court explained in *De Canas v. Bica*,[5] it would have been unnecessary, in decisions of the Court that preceded *De Canas*, "even to discuss the relevant congressional enactments in finding pre-emption of state regulation if all state regulation of aliens was ipso facto regulation of immigration, for the existence vel non of federal regulation is wholly irrelevant

---

[1] City of Farmers Branch, Tex., Ordinance 2952 (Jan. 22, 2008), *permanently enjoined by Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 701 F. Supp. 2d 835, 859 (N.D. Tex. 2010).

[2] *Id.* § 1 (to be codified at ORDINANCES § 26-79(E)); *id.* § 3 (to be codified at ORDINANCES § 26-119(E)).

[3] *See, e.g.*, *De Canas v. Bica*, 424 U.S. 351, 354 (1976).

[4] *Id.* at 355.

[5] 424 U.S. 351 (1976).

if the Constitution of its own force requires pre-emption of such state regulation."[6]

As to field preemption, I largely agree with JUDGE HIGGINSON's specially concurring opinion that there is no field preemption of the Ordinance. Congressional regulation of "'the nature of the . . . subject matter,'" which in this case is the availability of rental housing to unlawfully present aliens, is not so extensive that it "'permits no other conclusion'" than preemption.[7] Nor has Congress "unmistakably so ordained" such that field preemption is required.[8]

Other parts of the Ordinance are preempted, if at all, if there is a conflict with federal law either because "'compliance with both federal and state regulations is a physical impossibility,'" which is not the case here, or the "state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"[9] We are admonished by the Supreme Court that "'[w]hat is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects.'"[10] We must also be mindful that "[i]n preemption analysis, courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose

---

[6] *Id.* at 355.

[7] *Id.* at 356 (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142 (1963)).

[8] *Id.* (internal quotation marks omitted).

[9] *Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012) (quoting *Fla. Lime*, 373 U.S. at 142; *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

[10] *Id.* (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)).

No. 10-10751

of Congress.'"[11]  The regulation of leasing and renting real property is within the historic police powers of the States.  As noted, however, certain provisions in the judicial review sections in the Ordinance conflict with federal immigration law.

## II

The Ordinance has provisions in section 1 that apply to leasing or renting single-family housing and virtually identical provisions in section 3 that apply to apartment complex rentals.  Section 1 of the Ordinance amended Section 26-79 of the Code of Ordinances of the City of Farmers Branch, and section 3 of the Ordinance amended section 26-119.  For ease of reference, I refer to both sections 1 and 3 in discussing "the Ordinance," unless otherwise indicated.  I first consider provisions of the Ordinance that create an offense applicable to—or that impose obligations upon—an individual.

## A

Subsection (B)(1) requires each occupant, prior to occupying leased or rented property, to obtain a residential occupancy license.[12]  It is an offense, under subsection (C)(1), if a person occupies leased or rental property without first obtaining a valid occupancy license.[13]  These provisions apply both to

---

[11] *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

[12] City of Farmers Branch, Tex., Ordinance 2952, § 1 (Jan. 22, 2008) (to be codified at CITY OF FARMERS BRANCH, TEX., CODE OF ORDINANCES § 26-79(B)(1) (2011)), *permanently enjoined by Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 701 F. Supp. 2d 835, 859 (N.D. Tex. 2010); *id.* § 3 (to be codified at ORDINANCES § 26-119(B)(1)).

[13] *Id.* § 1 (to be codified at ORDINANCES § 26-79(C)(1)); *id.* § 3 (to be codified at ORDINANCES § 26-119(C)(1)).

No. 10-10751

citizens of the United States and to non-citizens. The question is whether these provisions are preempted by federal law to the extent they apply to aliens who are not lawfully present in the United States.

To obtain an occupancy license under the Ordinance, a person must submit an application that contains *one* of the following:

(1) a statement that applicant is a United States citizen or national;

(2) if the applicant is not a citizen or national, a federal government identification number that the applicant believes establishes lawful presence in the United States;

*or*

(3) if the applicant does not know of a federal identification number, a declaration that he or she does not know of such a number.[14]

The Ordinance explicitly provides that a declaration that an applicant "does not know of any such number . . . shall be sufficient to satisfy this

---

[14] *See id.* § 1 (to be codified at ORDINANCES § 26-79(B)(5)(h),(i)); *id.* § 3 (to be codified at ORDINANCES § 26-119(B)(5)(h), (i)). Each section provides in pertinent part:

The form shall require the following information:
\* \* \*
(h) if the applicant is a United States citizen or national, a signed declaration that the applicant is a United States citizen or national; . . .
-or-
(i) if the applicant is not a United States citizen or national, an identification number assigned by the federal government that the occupant believes establishes his or her lawful presence in the United States (examples include, but are not limited to: resident alien card number, visa number, "A" number, I-94 registration number, employment authorization number, or any other number on a document issued by the U.S. Government). If the applicant does not know of any such number, he or she shall so declare. Such a declaration shall be sufficient to satisfy this requirement.

requirement."[15]

This means that if a person is unlawfully present in the United States, she may truthfully declare that she does not know of any federal identification number that she believes establishes her lawful presence in the United States. If an application contains such a declaration, the building inspector "shall immediately issue a residential occupancy license."[16] The Ordinance continues in the next sentence: "[t]he building inspector shall not deny a residential occupancy license to any occupant who submits a completed application and pays the application fee,"[17] making it unmistakably clear that a declaration that a prospective tenant knows of no federal identification number that establishes lawful presence in the United States is not a bar to receiving an occupancy license. Accordingly, a person unlawfully present in the United States may obtain an occupancy license by truthfully disclosing that she knows of no federal documentation that would permit her lawful presence in this country.

After issuing a license to someone who has not declared herself to be a citizen or national of the United States, the Ordinance directs the building inspector to avail herself of 8 U.S.C. § 1373(c)[18] to "verify with the federal

---

[15] *Id.* § 1 (to be codified at ORDINANCES § 26-79(B)(5)(i)); *id.* § 3 (to be codified at ORDINANCES § 26-119(B)(5)(i)).

[16] *Id.* § 1 (to be codified at ORDINANCES § 26-79(B)(6)); *id.* § 3 (to be codified at ORDINANCES § 26-119(B)(6)).

[17] *Id.*

[18] 8 U.S.C. § 1373(c) provides:

(c) Obligation to respond to inquiries
The Immigration and Naturalization Service shall respond to an inquiry by a

government whether the occupant is an alien lawfully present in the United States."[19] It is only if the federal government reports that the occupant is an alien not "lawfully present" in the United States that there is a consequence to the alien. That consequence is revocation of the occupancy license.[20] As a practical matter, this is designed to lead the landlord to evict an unlawfully present alien from the premises because of the provisions of the Ordinance that are aimed at the landlord.[21]

The appellees characterize the Ordinance as "an alien registration scheme" in an effort to shoehorn it into the Supreme Court's statement in *Arizona v. United States* that "the Federal Government has occupied the field of alien registration."[22] The state law found to be field preempted in *Arizona* penalized as a misdemeanor the "'willful failure to complete or carry an alien registration document . . . in violation of [8 U.S.C. § 1304(e) or 1306(a)].'"[23] The Farmers Branch Ordinance does not penalize the failure to register or to carry documentation. It revokes an occupancy license because of the *status* of an

---

Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

[19] Ordinance 2952, § 1 (to be codified at ORDINANCES § 26-79(D)(1)); *id.* § 3 (to be codified at ORDINANCES § 26-119(D)(1)).

[20] *Id.* § 1 (to be codified at ORDINANCES § 26-79(D)(4)); *id.* § 3 (to be codified at ORDINANCES § 26-119(D)(4)).

[21] *Id.* § 1 (to be codified at ORDINANCES § 26-79(C)(6)-(7)); *id.* § 3 (to be codified at ORDINANCES § 26-119(C)(6)-(7)).

[22] 132 S. Ct. 2492, 2502 (2012).

[23] *Id.* at 2501.

alien as unlawfully present in the United States.  If the Appellees' argument were accepted, no state or local government could refuse to grant permits or licenses to someone unlawfully present in the United States.  The denial or revocation of a permit would be deemed an "alien registration scheme" simply because it would affect those who could not obtain federal documentation reflecting a lawful right to be present in the United States.  The Court's reasoning in *Arizona* cannot be stretched this far.  To the contrary, the Court's decision in *Arizona* supports the conclusion that unless and until Congress comprehensively regulates the housing of aliens, "a State ha[s] authority to pass its own laws on the subject."[24]

One of the state laws at issue in *Arizona* made it a misdemeanor for "'an unauthorized alien to knowingly apply for work.'"[25]  The Court made clear that "[w]hen there was no comprehensive federal program regulating the employment of unauthorized aliens, this Court found that a State had authority to pass its own laws on the subject."[26]  Citing its decision in *De Canas*, the Court explained that at a time when "the Federal Government had expressed no more than 'a peripheral concern with [the] employment of illegal entrants,'" a state could impose "civil penalties on the employment of aliens who were 'not entitled to lawful residence in the United States.'"[27]  The current state of the federal law governing the housing of aliens is indistinguishable

---

[24] *Id.* at 2503.

[25] *Id.*

[26] *Id.*

[27] *Id.*

No. 10-10751

from the state of the law governing the employment of aliens at the time that *De Canas* was decided. The federal government has expressed "no more than 'a peripheral concern'"[28] with the availability of housing to aliens.

After *De Canas* was decided, Congress enacted the Immigration Reform and Control Act of 1986 (IRCA)[29] "as a comprehensive framework for 'combating the employment of illegal aliens.'"[30] In *Arizona*, the Court examined the substance of this enactment, cataloguing the civil penalties imposed under federal law, including removal of the alien, for engaging in unauthorized employment and noting the criminal penalty for obtaining employment through fraudulent means.[31] The Court concluded that "Congress made a deliberate choice not to impose criminal penalties on aliens who seek, or engage in, unauthorized employment."[32] It was only because of the comprehensive nature of the federal scheme and Congress's *intentional* decision not to make it a crime for aliens to seek or engage in unauthorized employment[33] that the

---

[28] *Id.* (quoting *De Canas v. Bica,* 424 U.S. 351, 360 (1976)).

[29] Pub. L. No. 99-603, 100 Stat. 3359 (codified in scattered sections of 8 U.S.C.).

[30] *Arizona v. United States*, 132 S. Ct. 2492, 2504 (2012) (quoting *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002)).

[31] *Id.*

[32] *Id.*

[33] *Id.* at 2505 ("The correct instruction to draw from the text, structure, and history of IRCA is that Congress decided it would be inappropriate to impose criminal penalties on aliens who seek or engage in unauthorized employment. It follows that a state law to the contrary is an obstacle to the regulatory system Congress chose."); *id.* ("'Where a comprehensive federal scheme intentionally leaves a portion of the regulated field without controls, *then* the pre-emptive inference can be drawn—not from federal inaction alone, but from inaction joined with action.'" (quoting *P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988))).

No. 10-10751

Court concluded that the Arizona statute both conflicted with the method of enforcement of the federal law and stood as "an obstacle to the regulatory system Congress chose."[34]

By contrast, Congress has regulated narrowly in the area of aliens obtaining housing, and where it has regulated, its intent and purposes are not inconsistent with, and certainly do not foreclose, local government regulation like the Ordinance. Federal law provides that most, if not all, aliens who are unlawfully present in the United States are not eligible for any State or local public benefit—including public or assisted housing—that is provided by State- or local-government-appropriated funding, unless a State affirmatively so provides by enacting a state law.[35] Federal law also provides, subject to certain narrow exceptions, that the States have authority to limit eligibility of aliens who are lawfully present in the United States for State public benefits, including public or assisted housing.[36]

Congress has not comprehensively regulated housing for aliens. There is no field preemption. The States remain free to regulate in this area.

**B**

If an applicant for an occupancy license is not a United States citizen or national, she may provide a federal identification number that she believes establishes her lawful presence in the United States.[37] Subsection (C)(2)

---

[34] *Id.*

[35] 8 U.S.C. § 1621.

[36] *Id.* §§ 1621(c)(1)(B), 1622(a).

[37] City of Farmers Branch, Tex., Ordinance 2952, § 1 (Jan. 22, 2008) (to be codified at CITY OF FARMERS BRANCH, TEX., CODE OF ORDINANCES § 26-79(B)(5)(i) (2011)), *permanently enjoined*

provides that "[i]t shall be an offense for a person to knowingly make a false statement of fact on an application for a residential occupancy license."[38]  It is similarly an offense under the Ordinance if a person knowingly makes a false statement that she is or has been a United States citizen or national.[39]  An offense under the Ordinance is punishable by a fine not to exceed $500.[40]  No party challenges these sections of the Ordinance.

## C

The Ordinance also provides in (C)(3) that it is an offense "to create, possess, sell, or distribute a counterfeit residential occupancy license."[41]  None of the parties challenges this provision of the Ordinance.  It is not preempted by any provision of federal law.  It pertains only to local occupancy licenses.

## III

The Ordinance has various provisions that apply to landlords or lessors, as distinguished from tenants or lessees.  A lessor must notify prospective lessees of the occupancy license requirements.[42]  This provision is not the focus

---

*by Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 701 F. Supp. 2d 835, 859 (N.D. Tex. 2010); *id.* § 3 (to be codified at ORDINANCES § 26-119(B)(5)(i)).

[38] *Id.* § 1 (to be codified at ORDINANCES § 26-79(C)(2)); *id.* § 3 (to be codified at ORDINANCES § 26-119(C)(2)).

[39] Ordinance 2952, § 1 (to be codified at ORDINANCES § 26-79(B)(5)(h), (C)(2)); *id.* § 3 (to be codified at ORDINANCES § 26-119(B)(5)(h), (C)(2)).

[40] *Id.* § 5.

[41] Ordinance 2952, § 1 (to be codified at ORDINANCES § 26-79(C)(3)); *id.* § 3 (to be codified at ORDINANCES § 26-119(C)(3)).

[42] *Id.* § 1 (to be codified at ORDINANCES § 26-79(B)(3)); *id.* § 3 (to be codified at ORDINANCES § 26-119(B)(3)).

of the present controversy, and in any event, it does not directly implicate federal immigration regulation.   The more contentious provisions of the Ordinance are designed to facilitate the termination of leases to aliens who are unlawfully present in the United States.

It is an offense if a landlord rents to a tenant without obtaining a copy of an occupancy license.[43]  It is an offense if the terms of the lease agreement fail to specify that occupying the premises without a license is an event of default.[44] It is similarly an offense for a lessor to permit someone to occupy the premises without a valid license, although the lessor has a defense if she attempted to terminate the lease.[45]  Each of these offenses is punishable by a fine of up to $500 each day that a violation occurs or continues.[46]  If a lessor knowingly permits occupancy without a valid license, the lessor's rental license will also be suspended.[47]

None of these provisions are preempted by federal law for the same reasons, discussed above, that the Ordinance's provisions aimed at tenants or lessees who are unlawfully present in the United States are not preempted. Congress has not comprehensively regulated housing for aliens.  The Supreme

---

[43] *Id.* § 1 (to be codified at ORDINANCES § 26-79(C)(4)); *id.* § 3 (to be codified at ORDINANCES § 26-119(C)(4)).

[44] *Id.* § 1 (to be codified at ORDINANCES § 26-79(C)(6)); *id.* § 3 (to be codified at ORDINANCES § 26-119(C)(6)).

[45] *Id.* § 1 (to be codified at ORDINANCES § 26-79(C)(7)); *id.* § 3 (to be codified at ORDINANCES § 26-119(C)(7)).

[46] *Id.* § 5.

[47] *Id.* § 1 (to be codified at ORDINANCES § 26-79(D)(5)); *id.* § 3 (to be codified at ORDINANCES § 26-119(D)(5)).

No. 10-10751

Court's decision in *De Canas* controls, unless and until Congress acts in this area.

**IV**

The appellees contend that federal law regarding harboring of unlawfully present aliens[48] preempts the Ordinance to the extent that the Ordinance creates an offense for landlords who "knowingly permit an occupant to occupy a single family residence without a valid residential occupancy license" or requires landlords to terminate leases when an unlawfully present alien's occupancy license has been revoked. However, there is no field preemption regarding housing for unlawful aliens, and therefore, the Ordinance under consideration differs from the state laws found preempted in *Arizona*.[49] The Supreme Court held in *Arizona* that a state law that "add[ed] a state-law penalty for conduct proscribed by federal law" was preempted, not because states are prohibited from enacting criminal laws that impose different penalties than federal law for the same conduct, but because "the Federal Government has occupied the field of alien registration."[50] There was *field preemption*. The Supreme Court emphasized that "[w]here Congress occupies an entire field, as it has in the field of alien registration, even complimentary state regulation is impermissible. Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to

---

[48] 8 U.S.C. § 1324.

[49] *Arizona v. United States*, 132 S. Ct. 2492, 2501-03 (2012).

[50] *Id.* at 2502.

federal standards."[51] In such circumstances, "[p]ermitting the State to impose its own penalties for the federal offenses . . . would conflict with the careful framework Congress adopted."[52]

I respectfully submit that the Supreme Court unequivocally held in *De Canas* that the federal harboring laws do not give rise to field preemption. In *De Canas*, the federal harboring law in existence at the time expressly provided that "'employment (including the usual and normal practices incidental to employment) shall not be deemed to constitute harboring.'"[53] But a California law criminalized knowingly employing an unlawfully present alien if that employment would have an adverse effect on lawful resident workers.[54] If the federal harboring statute occupied either the field of harboring aliens or the field of employing aliens, then a state would not have been permitted to legislate at all in these areas,[55] and certainly, a state would not be permitted to criminalize conduct that the federal law explicitly said was not an offense. The Supreme Court squarely held that the federal harboring laws did not give rise to field preemption and therefore that the California law was not preempted, even though it was contrary to federal law.[56]

---

[51] *Id.* (citing *Silkwood v. Kerr McGee Corp.*, 464 U.S. 238, 249 (1984)).

[52] *Id.*

[53] *De Canas v. Bica*, 424 U.S. 358, 361 (1976) (quoting 8 U.S.C. § 1324(a) (1976) (amended 1986)).

[54] *Id.* at 352.

[55] *Arizona*, 132 S. Ct. at 2502 ("Where Congress occupies an entire field, as it has in the field of alien registration, even complimentary state regulation is impermissible.").

[56] *De Canas*, 424 U.S. at 360-61.

No. 10-10751

The contention is made that the Ordinance is conflict preempted because it "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'"[57] with regard to the federal harboring laws. It is true that Congress has expressed its intent that the federal government is to be the exclusive decision maker as to whether someone harboring aliens should be prosecuted. However, the Ordinance is not aimed at that conduct. The Ordinance exacts a penalty for continuing to lease property to a person whom the lessor knows no longer has a valid occupancy license. The lessor commits an offense only after (1) federal authorities have determined, not once but twice, that the occupant of the leased premises is not lawfully present in the United States;[58] (2) the occupant and the lessor have been given notice that the resident's occupancy license will be revoked effective 15 days after the date of the revocation notice;[59] and (3) if the lessor thereafter takes no action to terminate the lease.[60] Additionally, it is a defense to prosecution if the lessor has diligently pursued steps under applicable law and the lease provisions to terminate the lease.[61]

---

[57] *Arizona*, 132 S. Ct. at 2501 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

[58] City of Farmers Branch, Tex., Ordinance 2952, § 1 (Jan. 22, 2008) (to be codified at CITY OF FARMERS BRANCH, TEX., CODE OF ORDINANCES § 26-79(D)(2), (4) (2011)), *permanently enjoined by Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 701 F. Supp. 2d 835, 859 (N.D. Tex. 2010); *id.* § 3 (to be codified at ORDINANCES § 26-119(D)(2), (4)).

[59] *Id.* § 1 (to be codified at ORDINANCES § 26-79(D)(4)); *id.* § 3 (to be codified at ORDINANCES § 26-119(D)(4)).

[60] *Id.* § 1 (to be codified at ORDINANCES § 26-79(C)(7)); *id.* § 3 (to be codified at ORDINANCES § 26-119(C)(7)).

[61] *Id.* § 1 (to be codified at ORDINANCES § 26-79(C)(7)); *id.* § 3 (to be codified at ORDINANCES § 26-119(C)(7)).

No. 10-10751

While there is, arguably, limited overlap between the federal offense of harboring an alien and the Ordinance, the elements of the federal and local offenses are quite distinct. So is the "evil" sought to be addressed by the respective laws. The federal harboring statute is aimed at prohibiting the secreting of individuals unlawfully present in the United States. The Ordinance is aimed at *terminating lease agreements* and doing so only after a lengthy public process in which the federal government has made a determination, twice, that the occupant was unlawfully present.[62] The Ordinance *requires* a local government official to bring the fact of an individual occupant's potentially unlawfully-present status to the attention of the federal government.[63] There is no "secreting" of an alien by the lessor because of the notifications to the federal government required by the Ordinance. It is not knowingly secreting or harboring that is the *actus rea* of the Ordinance. The *actus rea* is the failure to terminate a lease once notice has been sent by a local government official that an occupancy license is no longer valid.[64] The lessor is not required by the Ordinance to terminate the unlawful alien's lease unless and until the federal government has twice advised a local government official, pursuant to a federal statute,[65] that the occupant is unlawfully present in the

---

[62] *See id.* § 1 (to be codified at ORDINANCES § 26-79(C)(7), (D)(1)-(5)); *id.* § 3 (to be codified at ORDINANCES § 26-119(C)(7), (D)(1)-(5)).

[63] *Id.* § 1 (to be codified at ORDINANCES § 26-79(D)(1)); *id.* § 3 (to be codified at ORDINANCES § 26-119(D)(1)).

[64] *Id.* § 1 (to be codified at ORDINANCES § 26-79(C)(7)); *id.* § 3 (to be codified at ORDINANCES § 26-119(C)(7)).

[65] 8 U.S.C. § 1373(c).

64

No. 10-10751

United States.[66]

The Ordinance contemplates that a lessor may gain knowledge that an occupant is unlawfully present in the United States and may nevertheless permit the alien to remain in the leased premises until the local government process is concluded and it is finally determined, within the potentially lengthy processes set forth in the Ordinance, that the alien is unlawfully present.[67] The federal harboring statute, by contrast, would arguably be violated once the lessor gains actual knowledge that the alien is unlawfully present and continues to permit the alien to occupy the leased premises.

The Ordinance does not stand as an obstacle to the accomplishment and execution of the full congressional purposes and objectives in enacting the harboring laws. The harboring laws encompass and proscribe conduct that is far broader than the Ordinance. The federal harboring laws and the Ordinance may be enforced simultaneously. Additionally, as noted earlier, federal law provides that most, if not all, aliens who are unlawfully present in the United States are not eligible for any State or local public benefit, including public or assisted housing, that is provided by State- or local-government-appropriated funding unless a State affirmatively so provides by enacting a state law. Federal law even allows States to deny State public-housing benefits to certain aliens who are lawfully present in the United States.[68] Requiring private

---

[66] Ordinance 2952, § 1 (to be codified at ORDINANCES § 26-79(D)(2), (4)); *id.* § 3 (to be codified at ORDINANCES § 26-119(D)(2), (4)).

[67] *See id.* § 1 (to be codified at ORDINANCES § 26-79(C)(7), (D)(1)-(5)); *id.* § 3 (to be codified at ORDINANCES § 26-119(C)(7), (D)(1)-(5)).

[68] 8 U.S.C. §§ 1621, 1622.

No. 10-10751

lessors and landlords to terminate leases when a determination has been made by the federal government that the occupant is unlawfully present in the United States is not in tension with this federally expressed policy.

## V

The argument is made that if all or a substantial number of states or local governments had laws similar to the Ordinance, then unlawfully present aliens whom the federal government had decided not to deport or remove would be unable to find housing. This, the appellees contend, would interfere with federal decisions about who is entitled to remain in the United States. Alternatively, it is asserted that there is conflict preemption.

The field preemption issue is once again resolved by *De Canas*. The fact that the federal government undeniably has the exclusive power to determine questions of removal and deportation does not give rise to field preemption of all state regulation that touches upon immigration. "The comprehensiveness of the INA scheme for regulation of immigration and naturalization, without more, cannot be said to draw in the employment of illegal aliens as 'plainly within . . . [that] central aim of federal regulation.'"[69] Just as there was no "more" regarding employment of illegal aliens at the time *De Canas* was decided, there is presently no "more" regarding housing of unlawfully present aliens.

For the same reasons that the Ordinance is not conflict preempted by the federal harboring laws, the Ordinance is not conflict preempted by the

---

[69] *De Canas v. Bica*, 424 U.S. 351, 359 (1976) (quoting *San Diego Unions v. Garmon*, 359 U.S. 236, 244 (1959)) (alterations in original).

authority of the federal government to determine whether an unlawfully present alien may remain in the United States. There is even less of a potential conflict between the Ordinance and the general grant of immigration authority to the federal government than there is a potential conflict with the harboring laws.

## VI

JUDGE HIGGINSON'S opinion discusses at some length whether federal authorities would be able to advise the Farmers Branch building inspector if an individual alien was "unlawfully present" in the United States.[70] With great respect, this has nothing whatsoever to do with whether the Ordinance is conflict-preempted. If the federal government, in response to an inquiry under 8 U.S.C. § 1373(c), will not or cannot advise the building inspector as to whether an alien is lawfully present, that is the end of the matter. The Ordinance expressly directs that "the building inspector shall take no further action until final verification from the federal government concerning the immigration status of the occupant is received."[71] The Ordinance could not be clearer that the building inspector has no authority to make a determination of whether an occupant is lawfully or unlawfully present: "[t]he building inspector shall not attempt to make an independent determination of any

---

[70] *Ante* at 14-16.

[71] Ordinance 2952, § 1 (to be codified at ORDINANCES § 26-79(D)(3)); *id.* § 3 (to be codified at ORDINANCES § 26-119(D)(3)).

occupant's lawful or unlawful presence in the United States."[72]

If the federal government responds to the Farmers Branch building inspector that an alien is unlawfully present in the United States, then there is no conflict with any federal law. The only consequence to the alien is the eventual termination of her lease by the lessor or landlord. There is no fine. There is no criminal offense. The *lessor or landlord* may commit an offense if it takes no steps to terminate the alien's lease, but for the reasons already considered, that is not in conflict with federal law.

It is highly improbable that under Texas law, a lessor or landlord would be arrested for committing such an offense, since it is unlikely that an offense would occur within plain view of an officer.[73] But even were that to occur, a state-law provision allowing arrest of a landlord or lessor is not equivalent to allowing arrest or detention of an alien. The Supreme Court's decision in *Arizona* dealt with a state law allowing arrest of an alien.[74]

## VII

The judicial review provisions of the Ordinance are problematic to some degree, though I disagree with JUDGE HIGGINSON'S opinion that all of the judicial review section is preempted. Subsection (E)(3) provides that a state court is to determine "whether the occupant is lawfully present in the United

---

[72] *Id.* § 1 (to be codified at ORDINANCES § 26-79(D)(3)); *id.* § 3 (to be codified at ORDINANCES § 26-119(D)(3)).

[73] *See* TEX. CODE CRIM. P. art. 14.01, 14.06, 15.17.

[74] *Arizona v. United States*, 132 S. Ct. 2492, 2505 (2012).

No. 10-10751

States."[75] This section would not conflict with federal law if the determination of the "lawfully present" status was limited to looking to the information provided by the federal government under 8 U.S.C. § 1373(c).

Subsection (E)(4), however, injects considerable uncertainty into the judicial review provisions. It provides that the question of whether an occupant is lawfully present in the United States "shall be determined under federal law."[76] Giving these words their natural construction might mean that a reviewing court is free to make its own determination of whether an alien is "lawfully present" by examining federal immigration law. Clearly, only the federal government may make a determination as to whether to admit, exclude, or remove an alien.[77] The next sentence in subsection (E)(4) further clouds the process that is to occur during judicial review. It says, "[i]n answering the question [of whether the occupant is lawfully present in the United States], the court shall be bound by any conclusive determination of immigration status by the federal government."[78] This sentence implies that if there is no conclusive determination of immigration status by the federal

---

[75] Ordinance 2952, § 1 (to be codified at ORDINANCES § 26-79(E)(3)); *id.* § 3 (to be codified at ORDINANCES § 26-119(E)(3)).

[76] *Id.* § 1 (to be codified at ORDINANCES § 26-79(E)(4)); *id.* § 3 (to be codified at ORDINANCES § 26-119(E)(4)).

[77] *See, e.g., Galvan v. Press*, 347 U.S. 522, 531 (1954) ("[T]hat the formulation of . . . policies [regarding the entry of aliens and their right to remain here] is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government."); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal government." (quoting *Fong Yue Ting v. United States*, 149 U.S. 698, 713 (1893))).

[78] Ordinance 2952, § 1 (to be codified at ORDINANCES § 26-79(E)(4)); *id.* § 3 (to be codified at ORDINANCES § 26-119(E)(4)).

government, then the state court is to determine that status by applying federal law. This would be in direct conflict with the federal immigration scheme, which leaves no room for a determination of immigration status other than through the immigration proceedings set forth under federal law.

Subsection (E)(5) provides that the state court shall take judicial notice of any immigration status previously provided by the federal government and that the state court may, and shall upon request of a party, request the federal government to provide "a new verification of the citizenship or immigration status of the occupant."[79] These provisions do not conflict in any way with federal law. However, subsection (E)(5) then provides that "[t]he most recent determination of the immigration status of an individual by the federal government shall create a rebuttable presumption as to the individual's immigration status."[80] This leaves room for a state court to substitute its own determination of immigration status, since the federal government's most recent determination is entitled only to a "rebuttable presumption."[81]

I would hold that subsection (E)(4) and the final sentence of subsection (E)(5) are preempted. However, the Ordinance contains a severability clause,[82]

---

[79] *Id.* § 1 (to be codified at ORDINANCES § 26-79(E)(5)); *id.* § 3 (to be codified at ORDINANCES § 26-119(E)(5)).

[80] *Id.* § 1 (to be codified at ORDINANCES § 26-79(E)(5)); *id.* § 3 (to be codified at ORDINANCES § 26-119(E)(5)).

[81] *Id.* § 1 (to be codified at ORDINANCES § 26-79(E)(5)); *id.* § 3 (to be codified at ORDINANCES § 26-119(E)(5)).

[82] Ordinance 2952, § 6.

No. 10-10751

and under Texas law, that clause would doubtless be given effect.[83]  I agree with the analysis and discussion of severability in the dissenting opinion of JUDGES JONES and ELROD.

* * *

I respectfully concur in the court's judgment in part and dissent in part, as indicated above.

---

[83] *See*, *e.g.*, *Quick v. City of Austin*, 7 S.W.3d 109, 115 (Tex. 1998); *Comm'n for Lawyer Discipline v. Benton*, 980 S.W.2d 425, 441 (Tex. 1998).

No. 10-10751

HIGGINSON, Circuit Judge, specially concurring:

I write separately to make two further observations.

First, the plaintiffs contend that the Ordinance is preempted by Congress's exclusive occupancy of the fields of removal, harboring, and registration. In my view, the Supreme Court's unanimous decision authored by Justice Brennan in *DeCanas v. Bica*, 424 U.S. 351 (1976), forecloses this argument. The Ordinance regulates the ability of non-citizens to obtain rental housing, and Congress has not determined that the housing of non-citizens falls within its exclusive authority. *See Chamber of Commerce of U.S. v. Whiting*, 131 S. Ct. 1968, 1985 (2011) (holding that "[i]mplied preemption analysis does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives'") (quoting *Gade v. Nat'l Solid Wastes Mgmt. Assn.*, 505 U.S. 88, 111 (1992) (internal quotation marks omitted)). The Supreme Court in *DeCanas* held that a California law forbidding employment to certain "alien[s] . . . not entitled to lawful residence in the United States" was not field preempted, because there was no specific indication that Congress "intended to preclude even harmonious state regulation touching on . . . the employment of illegal aliens." 424 U.S. at 365, 357-58. Ten years later, Congress, seeing the need for "some form of [federal] employer sanctions . . . if illegal migration is to be curtailed,"[1] enacted the Immigration Reform and Control Act of 1986 (IRCA), which expressly preempted conflicting state

---

[1] U.S. Immigration Policy and the National Interest: The Final Report and Recommendations of the Select Commission on Immigration and Refugee Policy with Supplemental Views by Commissioners 65-66 (1981).

statutes.[2] Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359.

Because no such comprehensive federal regulation has emerged, or been identified to us, that governs the housing of non-citizens present in the country contrary to law, I do not perceive that the Supremacy Clause acts as a "complete ouster of state power" in this area. *DeCanas*, 424 U.S. at 357. We presume that the historic police powers of the States are not "superseded . . . unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). Until Congress clearly intercedes, as it did with employment, *DeCanas* suggests that we not interfere with the political process and "oust" state police powers as impliedly preempted. 424 U.S. at 3517 ("[W]e will not presume that Congress, in enacting the [Immigration and Nationality Act], intended to oust state authority to regulate the employment relationship . . . in a manner consistent with pertinent federal laws.").[3]

Second, taking more guidance from *Arizona*, 132 S. Ct. at 2510 ("This opinion does not foreclose other preemption and constitutional challenges to the law as interpreted and applied after it goes into effect."), I would point out

---

[2] IRCA contains a savings clause expressly preempting "any State or local law imposing civil or criminal sanctions . . . upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens," but excludes "licensing and similar laws" from the preemption clause. 8 U.S.C. § 1324a(h)(2). Notably, the Supreme Court recently held that an Arizona law allowing state courts to suspend or revoke an employer's business license if the employer knowingly employed an "unauthorized alien" fell under IRCA's "licensing" exception and was therefore not preempted by IRCA. *Whiting*, 131 S. Ct. at 1978.

[3] Undoubtedly, there is complexity applying *DeCanas* to the field of "sub-federal immigration regulation." *See generally* Pratheepan Gulasekaram & Rose Cuison Villazor, *Sanctuary Policies & Immigration Federalism: A Dialectic Analysis*, 55 Wayne L. Rev. 1683, 1707–15 (2009).

that several other constitutional claims, under due process, equal protection, and the Privileges and Immunities and Commerce Clauses, were raised by the plaintiffs below but not reached by the district court. In particular, the Ordinance, inasmuch as it attempts to isolate Farmers Branch from a problem common to other states by burdening other localities with non-citizens illegally in the United States, may be invalid under the dormant Commerce Clause.[4] As Justice Cardozo wrote in *Baldwin v. G.A.F. Seelig, Inc.*, "the peoples of the several states must sink or swim together." 294 U.S. 511, 523 (1935); *see also Oregon Waste Sys., Inc. v. Dep't of Envt'l Quality of the State of Or.*, 511 U.S. 93 (1994); *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 92 (1984) ("The fact that the state policy . . . appears to be consistent with federal policy – or even that state policy furthers the goals we might believe that Congress had in mind – is an insufficient indicium of congressional intent."); *Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978); *Dean Milk Co. v. Madison*, 340 U.S. 349, 354 n.4 (1951) (dormant Commerce Clause applies to municipal as well as to state protectionism); *Serv. Mach. & Shipbuilding Corp. v. Edwards*, 617 F.2d 70, 73-76 (5th Cir. 1980) ("The movement of persons falls within the protection of the commerce clause.").

For the above reasons, I add this special concurrence to the judgment of the court.

---

[4] The dissent's endorsement of perceived police power authority to exclude fugitives only highlights the Ordinance's constitutional dubiety in this regard.

No. 10-10751

EDITH H. JONES and JENNIFER WALKER ELROD, Circuit Judges, dissenting, joined by JOLLY, SMITH and CLEMENT, Circuit Judges.

Three opinions have been written, each of which holds unconstitutional the City of Farmers Branch Ordinance 2952 ("the Ordinance"), which would establish a licensing regime for the rental of single-family homes and apartments in the City, and thereby seeks to discourage illegal immigrants from residing there. Two of the opinions (Reavley, J. and Dennis, J.) assert essentially that the Ordinance is incompatible with the national government's exclusive authority to regulate foreign relations and immigration. The third (Higginson, J.) purports to find narrower conflicts between the Ordinance's "criminal" enforcement and judicial review provisions and federal law prohibiting the "harboring" of illegal aliens,  8 U.S.C. § 1324 (a)(1)(A)(iii), and federal removal procedures, before holding these provisions non-severable from the rest of the Ordinance.

The Ordinance was passed during a period of intense national debate concerning the fate of millions of people present in this country who entered without passing official inspection or who overstayed visas or entry permits. A court does not have the luxury of entering into this debate, nor may we judge the wisdom of a local law. *Villas at Parkside Partners v. City of Farmers Branch*, 675 F.3d 802, 826, 831 (5th Cir. 2012) (Elrod, J., dissenting). Our responsibility is to determine whether the Ordinance accords with principles of federalism, the Supremacy Clause, and relevant Supreme Court decisions. We would hold that it does. In an opinion just issued concerning a nearly identical local law, the Eighth Circuit agreed with us. *Keller v. City of Fremont*, 2013 WL 3242111 (8th Cir. June 28, 2013).

No. 10-10751

We first highlight aspects of the Ordinance that have been neglected or mischaracterized in the three opposing opinions. We then address the standards of appellate review, which have also been shortchanged by those opinions. Next, preemption principles are applied to the Ordinance's licensing provisions. Finally, we analyze the conflict preemption and severability arguments raised by the Higginson opinion.

Our conclusions may easily be summarized. The Ordinance represents an exercise of the "police power" inherent in every self-governing community to make laws perceived beneficial to its citizens. It is thus entitled to a presumption of constitutionality according to every recent Supreme Court case dealing with local regulations that touch on the presence of illegal aliens.

The Ordinance does not constitute a regulation of immigration and thus is not preempted by the Constitution's structure.

There is no "field preemption" of this Ordinance by federal immigration or foreign relations law. Otherwise, the recent Supreme Court opinions would neither have approved some local regulations bearing on immigrants nor gone to such lengths to explain precise conflicts between those regulations and federal law. *See Keller*, 2013 WL 3242111, at *3–7.

The Ordinance's licensing and fines provisions do not conflict with federal law. The Ordinance does not conflict with any positive federal law governing the housing of illegal aliens, as no such law exists.

The Ordinance does not conflict directly with or serve "as an obstacle" to (a) the federal law against "harboring" illegal aliens, (b) federal procedures for removing illegal aliens from the United States, or (c) other provisions alluded to in the Higginson opinion. *See id.* at *7–9.

No. 10-10751

Finally, because the Ordinance's provisions setting fines and authorizing judicial review are readily severable from its licensing regime, the Higginson opinion's conclusion of non-severability fails logically and under Texas law.

## I. The Ordinance

The Ordinance is outlined in the Higginson opinion, but several features should be emphasized. The licensing regime applies to all landlords and renters of apartments and single family residences, whether citizens or not. Any applicant for a rental license receives one *automatically* by either verifying citizenship or legal residence or by asserting he does not know whether he has a relevant federal "number" identifying legal presence.[1]  FARMERS BRANCH, TEX., ORDINANCE 2952, §§ 1(B)(6), 3(B)(6). For a non-citizen applicant, the city building inspector conducts an inquiry with federal authorities to determine whether the renter is lawfully present in the United States. *Id.* §§ 1(D)(1), 3(D)(1). The federal government is obliged by law to respond to the inquiry, as it routinely responds to similar inquiries by all manner of local agencies and law enforcement. 8 U.S.C. § 1373(c).[2] The building inspector is bound to abide by the response. If the federal government states that the alien is lawfully present, or if the federal government's records reveal uncertainty about the alien's status, the applicant retains a license. No further action is taken by the

---

[1] While the application requires potential renters to provide general information such as name, address, date of birth, and country of citizenship, there is no affirmative obligation to declare that one is lawfully present prior to receiving a valid occupancy license. *See* FARMERS BRANCH, TEX., ORDINANCE 2952, §§ 1(B)(5)(i), 3(B)(5)(i).

[2] "The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c).

No. 10-10751

building inspector until the federal government provides final verification concerning the immigration status of the occupant or requests additional information. ORDINANCE 2952, §§ 1(D)(3), 3(D)(3).

Only if the federal government states that the renter is not lawfully present does the building inspector pursue the inquiry. *Id*. §§ 1(D)(2), 3(D)(2). The Ordinance then provides the renter and the landlord an additional 60 days to clarify the alien's status. *Id*. After the 60th day, if the building inspector remains unsatisfied with the explanation, the inspector may again contact the federal government. The Ordinance allows revocation of the occupancy license only if the federal government again reports that the individual is "an alien who is not lawfully present in the United States." *Id*. at §§ 1(D)(4), 3(D)(4).

After this second verification from the federal government that the renter is "not lawfully present in the United States," the building inspector must send a revocation notice to the renter and lessor. *Id*. Fifteen days after the revocation notice is issued, the previously valid residential occupancy license is revoked. *Id*.

After the renter's residential occupancy license has been revoked, the Ordinance specifies that the landlord commits an offense if it fails to initiate proceedings to terminate the lease. *Id*. §§ 1(C)(7), 3(C)(7). Any renter who applied for and received a valid residential occupancy license that the building inspector later revokes has not committed any offense, even if the renter

continues to reside in the rental premises after the license is revoked.[3] *See id.* §§ 1(C), 3(C).

A conviction for violating the Ordinance is punishable by a fine not to exceed $500 for each day of an ongoing violation of the Ordinance. *Id.* § 5.

The Ordinance specifies that it "shall be applied uniformly, and enforcement procedures shall not differ based on a person's race, ethnicity, religion, or national origin." *Id.* §§ 1(D)(9), 3(D)(9).

Judicial review may be sought by any landlord or renter, but not by the City. *Id.* §§ 1(E), 3(E). The state court is bound by "any conclusive determination of immigration status by the federal government," and the most recent determination of immigration status by the federal government "shall create a rebuttable presumption as to the individual's immigration status." *Id.* §§ 1(E)(4) & (5), 3(E)(4)(5). Finally, the Ordinance "shall be implemented in a manner fully consistent with federal law regulating immigration and protecting the civil rights of all citizens, nationals, and aliens." *Id.* §§ 1(F), 3(F).

To insulate the Ordinance against legal invalidation, there is a severability clause. *Id.* § 6.

A few obvious facts surrounding the Ordinance should also be noted. It does not apply to the purchase of residences or apartment houses or any other real estate within Farmers Branch. *Cf. id.* § 1 (regulating single-family rental

---

[3] A renter may, however, commit an offense if he: (1) occupies a leased or rented apartment *before* obtaining a residential occupancy license, *id.* §§ 1(C)(1); 3(C)(1); (2) knowingly makes a false statement of fact on a residential occupancy license application, *id.* §§ 1(C)(2); 3(C)(2); or (3) creates, possesses, sells, or distributes a counterfeit residential occupancy license, *id.* §§ 1(C)(3); 3(C)(3).

housing); § 3 (regulating apartment complex rentals). It does not apply to illegal aliens who are visitors in rental housing. *Id.* §§ 1(A)(5), 3(A)(5). It does not apply to hotels, suite-hotel residences, or motels. It does not apply to shelters where illegal aliens do not reside as tenants. It does not affect the hiring or employment of illegal aliens. The Ordinance, therefore, is far from banning illegal aliens from the City of Farmers Branch. The City's enforcement of the Ordinance in no way affects the federal government's decision whether to remove any illegal alien, nor does it effect any alien's removal from the United States.

## II.  Standards of Review / Relevant Preemption Principles

The ultimate issue in this case is whether the district court correctly determined that federal law preempts the Ordinance. The district court's preemption determination presents "a question of law that we review de novo." *See Franks Inv. Co. LLC v. Union Pac. R.R. Co.*, 593 F.3d 404, 407 (5th Cir. 2010) (en banc) (citation omitted). That standard, however, is only the beginning of the analytical rules we must apply. The nature of the Appellees' lawsuit—a facial, prospective challenge—and the character of the Ordinance—a housing regulation that falls within the City's police power—necessarily affect our analysis.

## A.  *Salerno* Principle Regarding Facial Challenges

That the Appellees waged a facial, prospective challenge to the Ordinance invokes standards of judicial restraint designed to further the interests of federalism and deference to duly passed legislation. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451, 128 S. Ct. 1184, 1191 (2008) (recognizing that facial challenges are generally disfavored

because they "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution").

Pursuant to *United States v. Salerno*, the Ordinance should not be held facially unconstitutional *in toto* unless "*no set of circumstances* exists under which the Act would be valid." 481 U.S. 739, 745, 107 S. Ct. 2095, 2100 (1987) (emphasis added); *see also Anderson v. Edwards*, 514 U.S. 143, 155 n.6, 115 S. Ct. 1291, 1298 n.6 (1995) (applying the *Salerno* standard in a preemption case); *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 593, 107 S. Ct. 1419, 1431 (1987) ("To defeat Granite Rock's facial challenge, the Coastal Commission needed merely to identify a possible set of permit conditions not in conflict with federal law.").[4] Under *Salerno*, if there are any permissible applications of the Ordinance, we should not completely invalidate it on the basis of a facial challenge.

Moreover, concomitant with *Salerno*, the City should have been given the opportunity to narrow the Ordinance, if needed, during the course of its enforcement activity or in judicial proceedings. *DeCanas v. Bica*, 424 U.S. 351, 363–64, 96 S. Ct. 933, 940–41 (1976) (explaining that the petitioners conceded part of the California regulation was unconstitutional on its face, but

---

[4] "[S]ome Members of the Court have criticized the *Salerno* formulation," *Wash. State Grange*, 552 U.S. at 449, 128 S. Ct. at 1190 (citation omitted), and the Court has also analyzed facial challenges by asking whether a statute has a "plainly legitimate sweep." *Washington v. Glucksberg*, 521 U.S. 702, 739–40 & n.7, 117 S. Ct. 2302, 2304–05 & n.7 (1997) (Stevens, J., concurring in the judgments) (citation omitted). In *United States v. Stevens*, the Court declined to determine which formulation of the standard is correct. *See* 130 S. Ct. 1577, 1587 (2010). Although we note this disagreement, the Supreme Court has not overruled the *Salerno* standard; to the contrary, the Court has continued to recite it. *See, e.g., id.* Therefore, the *Salerno* standard remains valid precedent, binding on us in this case.

recognizing that the state could give the provision a limiting construction and therefore leaving it for the state courts to later decide in the first instance whether the provision would conflict with federal law). Unfortunately, the three opposing opinions fail to heed, much less apply, these limits on our review powers. They invalidate the Ordinance without acknowledging its valid application to citizens and legally resident aliens.

### B. The Ordinance Is Within the Police Power

The Ordinance, correctly viewed, falls within the traditional police power of the City to regulate housing by means of licensing.

Historically, the police power extends to whatever measures a polity chooses to enact to protect, preserve, and enhance the lives of its citizens. *See Gonzales v. Oregon*, 546 U.S. 243, 270, 126 S. Ct. 904, 923 (2006) (describing the police power as legislation related to "the protection of the lives, limbs, health, comfort, and quiet" of the citizenry (quoting *Medtronic, Inc. v. Lohr*, 518 U.S 470, 475 (1996))). The police power extends so far as to include rent controls; building codes that regulate for the sake of safety or aesthetics; and excluding certain establishments, from liquor stores to topless clubs, from various areas. *See, e.g.*, *Pennell v. City of San Jose*, 485 U.S. 1, 11–12, 108 S. Ct. 849, 857–58 (1988) (permitting extensive rent and price controls as "legitimate exercise of . . . police powers").

The police power no doubt empowers Farmers Branch to enact a licensing regime to exclude child predators from living in multifamily apartment complexes, and it would enable the City to ban federal or state fugitives from justice from residing in the community. *See, e.g.*, *United States v. Morrison*, 529 U.S. 598, 618, 120 S. Ct. 1740, 1754 (2000) ("Indeed, we can think of no

better example of the police power . . . than the suppression of violent crime and the vindication of its victims." (footnote and citations omitted)); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212, 95 S. Ct. 2268, 2274 (1975) (describing city's "police power to protect children" as "undoubted"); *see also Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 843, 107 S. Ct. 3141, 3152 (1987) ("It is also by now commonplace that this Court's review of the rationality of a State's exercise of its police power demands only that the State '*could rationally have decided*' that the measure adopted might achieve the State's objective." (quoting *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466, 101 S. Ct. 715, 725 (1981))). It would seem to follow that the City's power to deter illegal aliens from renting qualifies as an exercise of the police power, so long as no invidious discrimination occurs.[5]

Characterizing the Ordinance as not within the incredibly broad reach of the City's police power, as two of the opposing opinions would do, is a very novel idea, unsupported by any Supreme Court authority. On the contrary, the Supreme Court confirmed that "California's attempt . . . to prohibit the knowing employment by California employers of persons not entitled to lawful residence in the United States, let alone to work here, *is certainly within the mainstream of such police power regulation.*" *DeCanas*, 424 U.S. at 356, 96 S. Ct. at 937 (emphasis added). The same conclusion applies for housing regulations touching illegal aliens.

---

[5] Judge Reavley's opinion implies invidious discrimination, but such issues were not decided by the trial court and remain pending.

No. 10-10751

## C.  Presumption of Constitutionality

Because the Ordinance involves the local police power, it is entitled to a strong presumption of constitutionality.  This presumption operates generally in federal preemption law.  *See, e.g., Wyeth v. Levine*, 555 U.S. 555, 565 129 S. Ct. 1187, 1194–95 (2009); *Altria Group, Inc. v. Good*, 555 U.S. 70, 76–77, 129 S. Ct. 538, 543 (2008).  It operates specifically in cases where local regulations within the police power are asserted to be preempted by federal immigration law.  In *DeCanas*, the Supreme Court treated a California statute that criminalized the hiring of illegal aliens as a regulation of employment and would not presume that Congress "intended to oust state authority to regulate the employment relationship covered by [the California statute] in a manner consistent with pertinent federal laws." *DeCanas*, 424 U.S. at 357, 96 S. Ct. at 938.  Likewise, in *Arizona v United States*, 132 S. Ct. 2492 (2012), the Court held that when conducting preemption analysis, "courts should assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." *Id.* at 2501 (internal quotations and citations omitted); *see also Chamber of Commerce of U.S. v. Whiting*, 131 S. Ct. 1968, 1983 (2011) (declining to preempt state law dealing with a traditional area of state concern); *Doe v. Plyler*, 628 F.2d 448, 452–53 (5th Cir. 1980), *aff'd on other grounds sub nom. Plyler v. Doe*, 457 U.S. 202, 102 S. Ct. 2382 (1982) (upholding charge of $1000 for education of illegal immigrants' children in public schools).  Unfortunately, none of the three opposing opinions accords the Ordinance this strong presumption, although Judge Higginson refers to it in his separate concurrence.

## D.  Preemption Rules

With these background rules set, the principles of federal preemption may be briefly summarized.  The Supremacy Clause holds the Constitution and acts of Congress to be supreme, displacing contrary state or local legislation "where there is an actual conflict between the two sets of legislation such that both cannot stand."  2 RONALD D. ROTUNDA & JOHN E. NOWAK, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE § 12.1 (4th ed. 2007).  In *Arizona*, the Supreme Court explained that federal law may preempt local law by an express statutory provision; by field preemption, Congress's placing a field within the "exclusive governance" of federal law; or by conflict preemption when state law actually conflicts with federal law.  *Arizona*, 132 S. Ct. at 2500–01.  Regarding field preemption, the Court cautioned in *DeCanas*: "[f]ederal regulation . . . should not be deemed preemptive of state regulatory power in the absence of persuasive reasons either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained."  424 U.S. at 356, 96 S. Ct. at 937 (alterations in original) (quoting *Fla. Lime & Avocado Growers v. Paul*, 373 U.S. 132, 142, 83 S. Ct. 1210, 1217 (1963)).  Consequently, in *Arizona*, the Court narrowly defined the field of "alien registration."  132 S. Ct. at 2502.  A local law conflicts with federal law either when compliance with both regulations "is a physical impossibility" or when the local law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Arizona*, 132 S. Ct. at 2501 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S. Ct. 399, 404 (1941)).

No. 10-10751

### III.    The Ordinance's Licensing Provisions

The Reavley and Dennis opinions express similar grounds for their conclusions that the Ordinance is wholly preempted.  The Reavley opinion states:  "Whether the Farmers Branch ordinance is preempted as an obstacle to the purposes and objectives of Congress in the field of immigration is a 'matter of judgment' informed by the federal scheme and the purpose and effects of the federal statutes as a whole."  Reavley Op. at 2 (citation omitted). The Dennis opinion concludes that "the Ordinance infringes on and conflicts with comprehensive and exclusively federal schemes for classifying noncitizens and with enforcing and adjudicating the implications of those federal classifications,"  and "thus stands as an obstacle to the full achievement of the purposes and objectives of uniform federal immigration law."  Dennis Op. at 10–11.  The reasoning of the two opinions frequently uses field preemption language, although both also speak of obstacle preemption.  Neither opinion identifies any specific conflict between the Ordinance's licensing provisions and federal law.  Both opinions  seem open to the interpretation that the primacy of the national interest in enforcing uniform immigration regulations leaves no room whatsoever for "local experimentation that deviates from 'the system Congress created.'"  Dennis Op. at 10 (citing *Arizona*, 132 S. Ct. at 2506–07).

We are thus required to address three separate arguments:  (1) the Ordinance is a regulation of immigration wholly outside state or local government powers under the Constitution; (2) the Ordinance is preempted because Congress "occupied the field" of alien housing through its web of regulations governing aliens' admission and duration of stay in this country; and (3) the Ordinance impliedly conflicts with and stands as an obstacle to the

enforcement of federal immigration laws.[6]  We address and refute each argument in turn.

### A. Constitutional Preemption

It is asserted that the Ordinance amounts to a "regulation of immigration" because preventing illegal aliens from renting apartments or single family dwellings in Farmers Branch is tantamount to determining that they may not reside within the United States.  If this assertion were accurate, it would be a bold holding.  Regulation-of-immigration preemption derives directly from the Constitution, which confers on the federal government the power to conduct foreign relations and to promulgate a "uniform Rule of Naturalization," U.S. CONST. art. I, § 8, cl. 4, and vests exclusive control over the "authority to control immigration—to admit or exclude aliens— . . . solely in the Federal government." *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 415, 68 S. Ct. 1138, 1141 (1948).  State laws imposing on the federal "authority to control immigration" are a "constitutionally proscribed regulation of immigration that Congress itself would be powerless to authorize or approve." *DeCanas*,  424 U.S. at 355–56, 96 S. Ct. at 936.  Even Congress could not delegate this power to the state or local governments.

In *DeCanas*, however, the Court rejected—in a single paragraph—reasoning similar to that in the Reavley and Dennis opinions. Justice Brennan, writing for a unanimous Court, declared that it "*never* held that every state enactment which in any way deals with aliens is a regulation

---

[6] The Dennis opinion suggests that the unilateral enforcement policy of the Executive Branch might preempt the Ordinance, a proposition squarely rejected by the Supreme Court in *Arizona.  See* Dennis Op. at note 3 and accompanying text.

of immigration and thus per se pre-empted by this constitutional power, whether latent or exercised." 424 U.S. at 355, 96 S. Ct. at 936 (emphasis added). The Court cited to a string of cases upholding "certain discriminatory state treatment of aliens lawfully within the United States." *Id.* Those cases "remain authority that, *standing alone, the fact that aliens are the subject of a state statute does not render it a regulation of immigration, which is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain.*" *Id.* (emphasis added). The Court rejected the California court's underlying assumption that a labor regulation targeting illegal aliens was a "regulation of immigration," explaining that "there would have been no need . . . even to discuss the relevant congressional enactments in finding pre-emption of state regulation if all state regulation of aliens was ipso facto regulation of immigration." *Id.* The Court depicted the California law at issue as a labor law "imposing criminal sanctions against state employers who knowingly employ aliens who have no federal right to employment within the country." *Id.*

The Reavley and Dennis opinions do not, because they cannot, demonstrate that the Ordinance runs afoul of the test in *DeCanas*. The Ordinance does not determine the entry or exit of anyone into or out of the United States. It does not determine the conditions under which a "lawful" immigrant may remain. And the Ordinance's grants or denials of rental licenses are designed to follow and correspond with federal determinations concerning each applicant. This should be the end of the constitutional preemption issue.

Nevertheless, the Reavley opinion implies that the Ordinance is an immigration regulation because it may force illegal aliens to relocate from certain rental housing in Farmers Branch. This view is inconsistent with authority from the Supreme Court, this court, and the Eighth Circuit in *Keller*.[7] The Court has upheld state statutes that, respectively, criminalized the knowing employment of illegal aliens and effectively forced them to relocate if they wish to be employed. *Whiting*, 131 S. Ct. at 1973; *DeCanas,* 424 U.S. at 355–56, 96 S. Ct. at 936–37. This circuit has held that a Texas statute denying free public education to illegal immigrant children was not preempted by federal law. *See Plyler*, 628 F.2d at 451–54.[8] Certainly, excluding one's children from free public education would be a deterrent to illegal aliens' remaining in Texas, although it would not affect their residence elsewhere in the country.

To the extent the Reavley and Dennis opinions would hold the Ordinance an invalid "regulation of immigration" because   the intent of the local legislators was to reinforce federal alien removal laws, the Supreme Court has rejected their arguments:

---

[7] *Keller* concluded: "Laws designed to deter, or even prohibit, unlawfully present aliens from residing within a *particular locality* are not tantamount to immigration laws establishing who may enter or remain in the country." *Keller v. City of Fremont*, 2013 WL 3242111, at *5 (8th Cir. June 28, 2013). Further, "[t]he rental provisions do not remove aliens from this country (or even the City), nor do they create a parallel local process to determine an alien's removability. Accordingly, they do not regulate immigration generally or conduct in the 'field' of alien removal." *Id.* at *6.

[8] In *Plyler*, this court held the Texas statute not preempted, but found it to violate the equal protection clause. *Doe v. Plyler*, 628 F.2d 448, 449–50 (5th Cir. 1980). The Supreme Court upheld the latter holding without ruling on the preemption decision, which remains the law of this circuit.

No. 10-10751

> Although the State has no direct interest in controlling entry into this country, that interest being one reserved by the Constitution to the Federal Government, unchecked unlawful migration might impair the State's economy generally, or the State's ability to provide some important service. *Despite the exclusive federal control of this Nation's borders, we cannot conclude that the States are without any power to deter the influx of persons entering the United States against federal law, and whose numbers might have a discernible impact on traditional state concerns.*

*Plyler*, 457 U.S. at 228 n.23, 102 S. Ct. at 2400 n.23 (emphasis added) (citing *DeCanas*, 424 U.S. at 354–56, 96 S. Ct. at 935–36). In disregard of this language, the Reavley and Dennis opinions would hold that states are powerless "to deter the influx" because any local law having such a purpose or effect would be an impermissible regulation of immigration. The ultimate proof of these opinions' error is the plain fact that, despite having ruled three times on preemption issues arising from local laws that affected illegal aliens, the Court has refused to treat any of them as constitutionally impermissible regulations of immigration. *See generally Arizona*, 132 S. Ct. 2492; *Whiting*, 131 S. Ct. 1968; *DeCanas*, 424 U.S. 351, 96 S. Ct. 933.[9]

---

[9] If the parties in *DeCanas* agreed on anything, it was that *both the intent and effect of Section 2805 were to discourage illegal immigration in California.* California passed the law, Petitioners explained, "to diminish the impact of the seemingly unstemmable flow of illegal aliens." Brief of Petitioners at 5, *DeCanas v. Bica*, 424 U.S. 351, 96 S. Ct. 933 (1976) (No. 74-882). In no uncertain terms, "[t]he underlying purpose of [Section] 2805 is a state labor policy designed to protect California wage-earners. It seeks to curtail the influx of illegal entrants" by "focus[ing] directly on the source of the problem, namely the hiring practice of local employers." *Id.* at 16. Respondents concurred: "[t]he ultimate objective of [Section 2805] is to expel all 'aliens not entitled to lawful residence' from California." "Section 2805 . . . seeks to control immigration into the State of California . . . by seeking to abolish their employment opportunities." Brief of Respondents at 6, *DeCanas v. Bica*, 424 U.S. 351, 96 S. Ct. 933 (1976) (No. 74-882). It is unfathomable that the Supreme Court would *uphold* the law in *DeCanas* if the intent and effect of discouraging illegal aliens were sufficient to transform a law into a "regulation of

No. 10-10751

## B. Field Preemption of Licensing Provisions

Field preemption differs from preemption by constitutional design because it depends on affirmative Congressional acts to "occupy the field" sought to be regulated. *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 115, 112 S. Ct. 2374, 2392 (1992) (Souter, J., dissenting) ("Field pre-emption is wrought by a manifestation of congressional intent to occupy an entire field . . . ." (citation omitted)). The Reavley and Dennis opinions both refer to field preemption. *See* Reavley Op. at 8 ("Congress has occupied the field of alien removal."); Dennis Op. at 8 ("If § 3 of the Arizona statute were valid, every State could give itself independent authority to prosecute federal registration violations . . . ." (quoting *Arizona*, 132 S. Ct. at 2502)). Their conclusions apparently hinge on the proposition that a municipal law requiring licenses for all renters and revoking them from illegal immigrants is sufficiently analogous to federal "removal procedures," which are "the sole and exclusive procedure for determining whether an alien may be . . . removed from the United States." 8 U.S.C. § 1229(a)(3).

The premise of this argument is wrong, however, because it conflicts with the Supreme Court's incontrovertible explanation of the "field" of removal proceedings. "A decision on removability requires a determination whether it is appropriate to allow a foreign national to continue living in the United States." *Arizona*, 132 S. Ct. at 2506. Taken together, *DeCanas*, *Whiting* and *Arizona* demonstrate how narrow the scope of field preemption is regarding local legislation that concerns illegal aliens. *DeCanas* rejected the contention

immigration."

that denying illegal aliens employment in California was the same as attempting to "remove" them, despite the practical consequence that lack of employment opportunities is an insuperable barrier to continued presence. *See* 424 U.S. at 356–63, 96 S. Ct. at 936–40. *Whiting* represents a corresponding decision not to hold that Congress "occupied the field" vis-a-vis the revocation of state business licenses that would befall Arizona businesses that hired illegal aliens. *See* 131 S. Ct. at 1977–87.

Finally, in *Arizona*, at most two provisions of SB 1070 were declared in conflict with a carefully defined "field" within immigration law. 132 S. Ct. at 2501–10. Section 3 of the bill allowed the arrest of aliens not carrying *federal* identification cards. *Id.* at 2501. The provision was held to "intrude[] on the field of alien registration," *id.*, a topic Congress had reserved to itself. *See Hines v Davidowitz*, 312 U.S. 52, 74, 61 S. Ct. 399, 408 (1941). Separate state enforcement of federal registration rules could "frustrate federal policies" by allowing criminal charges against individuals for federal violations where the officials "in charge of the comprehensive scheme" of registration determined no prosecution should occur. *Arizona*, 132 S. Ct. at 2503. Like § 3, another provision of the Arizona law—§ 6—enabled local law enforcement to effect a warrantless arrest "if the officer has probable cause" to believe the arrestee has committed an offense rendering him "removable from the United States." *Id.* at 2505. Whether the Court held § 6 field or conflict preempted is somewhat unclear. Assuming that the Court's ruling was based on field preemption, its concern was local government overlap with the "field" of alien removal from this country; the provision "violate[d] the principle that the removal process is entrusted" to federal discretion. *Id.* at 2506. Thus, it "attempt[ed] to provide

state officers even greater authority to arrest aliens on the basis of possible removability than Congress has given to trained federal immigration officers." *Id.*

*Arizona* is consistent with *DeCanas* and *Whiting* while distinguishable from this case. Although the Court held at most two sections field-preempted, another—§ 2(B)—was provisionally upheld, *id*. at 2507–10, and a fourth—§ 5(C)—was overturned on conflict preemption alone. *Id*. at 2503–05. As in previous cases, the Court was cautious in using the broad proscription of local authority that inheres in field preemption. Moreover, § 3 and § 6 of Arizona SB 1070 were intended to employ local law enforcement not for purposes of enforcing a local ordinance, but solely to assist federal officers in removing illegal aliens from this country. The Ordinance has no similar intent or mechanism. It is not field preempted.

## C. Conflict Preemption of Licensing Provisions

Conflict preemption may arise from a specific legislative command, from the impossibility of compliance with both federal and local law, or from the local law's obstruction of the means and purposes of federal regulation. *See Arizona*, 132 S. Ct. at 2500–01. The Reavley and Dennis opinions rely on "obstacle" preemption, as they must. That is because Congress has passed no expressly preemptive provision concerning illegal alien housing, and no federal law affirmatively regulates where aliens who are illegally present in the United States may live.[10] Consequently, neither express nor impossibility preemption is at issue here. These opinions instead focus broadly on the Ordinance's

---

[10] The scope of the proscription on "harboring" illegal aliens will be considered in the next section.

alleged conflict with federal alien removal procedures, the complexity of alien classifications, and the considerable discretion entrusted by law to federal immigration officials. Although both opinions cite *Arizona* extensively, neither one mentions *Whiting*, in which the Supreme Court only two years ago held that an Arizona law requiring employers to verify their employees' lawful immigration status does not pose an obstacle to the enforcement of federal immigration policy. *Whiting*, 131 S. Ct. at 1985–87. This case should be controlled by the *Whiting* implied preemption analysis.

Setting the stage for our conclusion are several facts about the Ordinance that the Reavley and Dennis opinions minimize. First, the Ordinance does not effect or affect illegal aliens' removal by deportation or otherwise from the United States. Second, the Ordinance is not a parallel enforcement scheme to assist the federal government in initiating or completing formal detention or removal proceedings. Rather, it is a licensing law that governs a subset of property owners and prospective tenants in Farmers Branch. Although illegal aliens' rental licenses may be revoked, the Ordinance contains no device by which a local government official may remit the alien to federal custody or attempt to compel the federal government to act against the alien for removal purposes. Third, enforcement of the Ordinance depends solely on two federal affirmations, rendered at least sixty days apart, that an alien is not lawfully present in the United States. The building inspector may not independently decide a renter's lawful status.

No. 10-10751

Furthermore, the federal government is required by law to respond to the City's inquiries.  8 U.S.C. § 1373(c).  One, but not necessarily the only,[11] system that the City may use is the federal Systematic Alien Verification for Entitlements ("SAVE") System.  If the federal government renders an opinion that the alien is lawfully present or that his status is unresolved in some way, the rental license may not be revoked.  The Ordinance thus overcompensates, rather than undercompensates, for the possibility that a renter is unlawfully present but not removable.  Certainly it is not facially inconsistent with federal status determinations.

In *Whiting*, the Supreme Court upheld an Arizona law requiring employers to verify the immigration status of their employees and revoking the employers' business licenses for willful violations.  The Supreme Court disposed of the contention that insofar as they concerned alien employment, the Arizona regulations intruded on a "uniquely federal area[] of regulation" by "upset[ting] the balance" Congress struck when it passed (post-*DeCanas*) specific legislation concerning alien employment.  *Whiting*, 131 S. Ct. at 1983, 1986–87 (Roberts, C.J., controlling opinion).[12]  The Court found no inherent conflict between

---

[11] The government as amicus in this case explains that the Department of Homeland Security has established several programs tailored to particular types of inquiries pursuant to § 1373.

[12] The implied preemption analysis received only four votes, as Justice Thomas joined the rest of the opinion and concurred in the judgment.  *Whiting*, 131 S. Ct. at 1973.  Justice Thomas has previously expressed disagreement with implied preemption jurisprudence more generally.  *See, e.g.*, *Wyeth v. Levine*, 555 U.S. at 583, 129 S. Ct. at 1205 (Thomas, J., concurring in the judgment) ("I write separately, however, because I cannot join the majority's implicit endorsement of far-reaching implied pre-emption doctrines.  In particular, I have become increasingly skeptical of this Court's 'purposes and objectives' pre-emption jurisprudence.  Under this approach, the Court routinely invalidates state laws based on perceived conflicts with broad federal policy objectives, legislative history, or generalized notions of congressional purposes that

95

federal and state law because the Arizona law was merely "[r]egulating in-state businesses through licensing laws." *Id.* at 1983. Similarly, the Ordinance here regulates local businesses through licensing laws. The Court also rejected the claim that the federal E-Verify system that employers use would not yield reliable answers concerning an alien's work authorization:

> The federal determination on which the State must rely is provided under 8 U.S.C. § 1373(c). That provision requires the Federal Government to "verify or ascertain" an individual's "citizenship or immigration status" in response to a state request. Justice BREYER is concerned that this information "says nothing about work authorization." Justice SOTOMAYOR shares that concern. But if a § 1373(c) inquiry reveals that someone is a United States citizen, that certainly answers the question whether that individual is authorized to work. The same would be true if the response to a § 1373(c) query disclosed that the individual was a lawful permanent resident alien or, on the other hand, had been ordered removed. In any event, *if the information provided under § 1373(c) does not confirm that an employee is an unauthorized alien, then the State cannot prove its case.*

*Id.* at 1982 (emphasis added) (internal citations omitted).

The dispositive answer to the concern about the Ordinance's wrongful revocation of rental licenses and alleged inconsistency with federal determinations is that the building inspector "cannot prove his case" if a federal inquiry does not conclusively establish that the renter is "not lawfully

---

are not embodied within the text of federal law. Because implied pre-emption doctrines that wander far from the statutory text are inconsistent with the Constitution, I concur only in the judgment.").

present."[13]

Judge Reavley's opinion also implies an infirmity in the Ordinance's potential imposition of fines on illegal aliens for violating the licensing requirements. This implication is derived from the Supreme Court's invalidation of § 5(C) of Arizona S.B. 1070, which criminalized illegal workers' attempts to find employment. *Arizona*, 132 S. Ct. at 2503. The Court found a clear conflict between Arizona's law and the federal Immigration Reform and Control Act ("IRCA"), which imposed various sanctions only on *employers* of illegal aliens. *Id.* at 2503–05. Further, the *Arizona* opinion shows that the legislative background of IRCA was critical to the Court's decision. *Id.* at 2504. That legislative history demonstrated "that Congress made a deliberate choice not to impose criminal penalties on aliens" for seeking employment. *Id.* Because the Court viewed IRCA as containing Congress's "considered judgment that making criminals out of aliens engaged in unauthorized work . . . would be inconsistent with federal policy and objectives," *id.*, the state's conflicting

---

[13] A red-herring variant of this conflict preemption argument is that the Ordinance's use of the term "alien unlawfully present in the United States" is either inconsistent with federal law or impossible to define. The district court rejected this argument, *Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 701 F. Supp. 2d 835 (N.D. Tex. 2010), and so do we. The term "lawfully present" is used in a number of federal statutes. *See*, *e.g.*, 8 U.S.C. §§ 1229a(c)(2); 1357(g)(10); 1182(a)(9)(B)(i)(II); 1621(d); 1623; 42 U.S.C. §§ 1436(a)(3); 1436(a)(5); 1437y; 4605; 26 U.S.C. § 3304; 7 U.S.C. § 2015(f); *see also* Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat. 119 (2010), at §§ 1411(c)(2)(B)(ii)(II); 1402(e)(2); 1411(c)(2)(B)(i)(1). Clearly, this term, used in federal laws ranging from (a) the provision of immigrant status information to local government entities to (b) the status determinations themselves to (c) the denial of various federal benefits and qualification for the newly enacted Affordable Care Act, must have a federal meaning. *See also* 27 C.F.R.§ 478.11, (defining "alien unlawfully in the United States"). The Ordinance uses this common federal term rather than a potentially confusing or conflicting local definition for the illegal aliens that it seeks to exclude from possessing rental licenses.

method of enforcement must be an "obstacle to the regulatory system Congress chose." *Id*. at 2505. Judge Reavley consequently opines that "criminalizing" illegal aliens' choice of housing similarly conflicts with Congress's designated alien removal procedures.

This complaint is at too high a level of generality: Any local licensing regulation touching the immigrant status—for instance, the refusal to issue drivers' licenses—could be said to conflict cosmically with the goals of federal immigration law. More concretely, this view overlooks the preface to this part of the *Arizona* discussion, which acknowledged that, in *DeCanas*, the Court had approved "State . . . authority to pass its own laws on the subject" "[w]hen there was no comprehensive federal program regulating the employment of unauthorized aliens." *Id*. at 2503. No extant federal law regulates the housing of illegal aliens. There is thus no evidence of a deliberate congressional choice on the subject; if anything, we ought to infer congressional ambivalence from the fact that Congress passed no law concerning either "sanctuary cities" or, at the opposite pole, cities that have attempted to discourage influxes of illegal aliens.

The Court's approach in *DeCanas* is more compelling here than Judge Reavley's, for *DeCanas* recognized that "States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State." 424 U.S. at 356, 96 S. Ct. at 937. At the time of that decision, the federal government "had expressed no more than 'a peripheral concern with [the] employment of illegal entrants.'" *Arizona*, 132 S. Ct. at 2503 (quoting *DeCanas*, 424 U.S. at 360, 96 S. Ct. at 939) (alteration in original). Relevant to this case, the federal government has expressed no more than a

peripheral concern with aliens' housing choices.

But *Whiting* stands as the most obdurate obstacle to the Reavley and Dennis opinions insofar as they assert conflict preemption of the Ordinance. *Whiting* held that "[r]egulating in-state businesses through licensing laws" that prohibited the knowing employment of illegal aliens, using means within the state's police power, stands as no obstacle to the enforcement of federal immigration law, even to federal law dealing with employers of illegal aliens.[14] 131 S. Ct. at 1983. The Court found that the mechanics of the Arizona law were enacted to correspond with federal determinations of alien status. *Id*. at 1981–83. Thus, the state's definition of "unauthorized alien" as an alien "not lawfully admitted for permanent residence," or not otherwise authorized to be employed, adopted the federal definition. *Id*. at 1981. State investigators were not allowed independently to determine unauthorized status but were bound by the federal government's determinations resulting from information furnished under 8 U.S.C. § 1373(c). *Id*. As a result, the Court held, "there can by definition be no conflict between state and federal law as to worker authorization, either at the investigatory or adjudicatory stage." *Id*.

Rejecting general contentions that conflict preemption was required to maintain the "balance" Congress struck in enacting certain federal restrictions on illegal alien employment, the Court found inapplicable the cases that involved "uniquely federal areas of regulation," because "[r]egulating in-state businesses through licensing laws has never been considered such an area of

---

[14] The existence of a federal savings provision for state "licensing" laws furnished an analytical part, but not the whole or decisive reasoning, why the Court held the Arizona licensing regulation not to be conflict-preempted. *See generally Whiting*, 131 S. Ct. 1968.

dominant federal concern." *Id.* at 1983. Finally, as it noted, "[l]icensing suspension and revocation are significant sanctions. But they are typical attributes of a licensing regime." *Id.*

We need not repeat the undisputed facts in the instant case to reinforce the analogy between the Ordinance and the Arizona law upheld in *Whiting.*

**IV. Conflict Preemption of Criminal Provisions**

The Higginson opinion turns principally on the view that fines can be levied on violators of the Ordinance. The potential criminal penalty for violations is a fine not to exceed $500, which qualifies it as a Texas Class C misdemeanor. Judge Higginson correctly notes that law enforcement officers may "arrest" and "detain" violators for such misdemeanor offenses, but this is rather overstated; Class C misdemeanors are not punishable by imprisonment and are typified by motor vehicle violation citations. Judge Higginson's conclusion that the Ordinance is conflict preempted largely rests upon two theories: (1) the Ordinance "interfer[es] with federal anti-harboring law," 8 U.S.C. § 1324(a)(A)(iii), and (2) the Ordinance "allow[s] state officers to 'hold[] aliens in custody for possible unlawful presence without federal direction and supervision.'" Higginson Op. at 7. Moreover, because his opinion holds a severability clause ineffective to divorce the licensing provisions from the potential fines, the Higginson opinion would overturn the Ordinance *in toto.* While expressing an allegedly narrow rationale for decision, the Higginson opinion's impact is as broad as that of the Reavley and Dennis opinions.

We disagree with the Higginson opinion's interpretation of the Ordinance, with its conflict preemption analysis, and with its non-severability ruling. If the Higginson opinion fails on any one of these elements, the

No. 10-10751

Ordinance must be upheld.  We discuss each of these elements in turn.

## A.     Possible Criminal Offenses under the Ordinance

Carefully examined, the Ordinance does not "criminalize" illegal aliens' presence in Farmers Branch, nor does it expose lessors to a duplicate penalty for "harboring" illegal aliens.  The Higginson opinion misreads the actions that constitute offenses under the Ordinance.

## 1.     Impact of Ordinance on Renters

Judge Higginson's conclusion that law officers will be able to hold aliens in custody for possible unlawful presence is inaccurate under the plain terms of the Ordinance.  Also, because the Ordinance does not penalize a tenant if he continues to reside in a Farmers Branch rental after his residential occupancy license is revoked, there is no basis to conclude that the federal anti-harboring statute conflict-preempts the Ordinance as applied to renters.

A renter (*i.e.*, an individual who is possibly "not lawfully present") can violate the Ordinance in only three ways:

(1)     by occupying a leased or rented apartment *before* obtaining a valid occupancy license;[15]

(2)     by "knowingly mak[ing] a false statement of fact on an application for a residential occupancy license," ORDINANCE 2952, §§ 1(C)(2), 3(C)(2); or

(3)     by "creat[ing], possess[ing], sell[ing], or distribut[ing] a counterfeit residential occupancy license."  *Id.* §§ 1(C)(3),

---

[15] *See* ORDINANCE 2952, §§ 1(C)(1), 3(C)(1) ("It shall be an offense for a person to be an occupant of a leased or rented apartment *without first obtaining* a valid occupancy license permitting the person to occupy that apartment." (emphasis added)); *Id.* §§ 1(B)(1), 3(B)(1) ("*Prior to* occupying any leased or rented apartment, each occupant must obtain a residential occupancy license." (emphasis added)).

No. 10-10751

3(C)(3).

In none of these three circumstances is the renter's lawful or unlawful immigration status relevant to potential fines.  Instead, the Ordinance penalizes renters only in the first circumstance, when they fail to apply for a residential occupancy license.[16]  Even if a renter is "not lawfully present," he automatically receives a residential occupancy license when he applies for one and, therefore, does not commit an offense.  *Id.* §§ 1(B)(6), 3(B)(6).

Critically, the Ordinance does not impose criminal liability on *any* renter after the renter applies for an occupancy license.[17]  This is because the Ordinance does not penalize a renter for continuing to occupy rental housing after the City revokes a residential occupancy license.[18]  Rather, if a license is

---

[16]  If a renter does not apply for a residential occupancy license, the City is never prompted to determine whether the renter is unlawfully present in the United States.  In this circumstance, if the City fines the renter (*i.e.,* imposes criminal liability) for the lack of a valid occupancy license, then the fine is solely for the failure to obtain a license—the renter's lawful or unlawful status is both unknown and completely irrelevant.

[17] Of course, to the extent a renter makes a false statement of fact on his application, such as providing a false name, the renter may later be deemed to have committed an offense.  *See* ORDINANCE 2952 §§ 1(C)(2), 3(C)(2).

[18] Judge Higginson contends that the Ordinance penalizes an "ongoing condition" and, therefore, a tenant commits an offense at *any* time he is an occupant without a valid occupancy license.  Higginson Op. 12 n.10.  While he suggests that our reading of the Ordinance is "strained," his construction of the Ordinance would read the words "first obtaining" out of the Ordinance.  Specifically, Judge Higginson's reading would be accurate if the Ordinance read: "It shall be an offense for a person to be an occupant of a leased or rented apartment without ~~first obtaining~~ a valid occupancy license permitting the person to occupy that apartment."  §§ 1(C)(1) & 3(C)(1) (alteration added).  Construing the Ordinance in this manner, however, renders the words "first obtaining" superfluous.  *See, e.g.*, *Duncan v. Walker*, 533 U.S. 167, 174, 121 S. Ct. 2120, 2125 (2001) ("[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal quotation marks omitted)).

revoked, the Ordinance makes only the lessor's conduct an offense.  In sum, at no time will the City—after determining that an individual is "not lawfully present"—be able to "arrest," "detain," or "fine" the renter.

## 2.    Impact of  Ordinance on Lessors

Judge Higginson also contends that the Ordinance is conflict-preempted because "by criminalizing conduct that does not have the effect of evading federal detection, and by giving state officials authority to act as immigration officers outside the 'limited circumstances' specified by federal law, the Ordinance 'interfere[s] with the careful balance struck by Congress' with respect to the harboring of non-citizens here contrary to law."  Higginson Op. at 11 (quoting *Arizona*, 132 S. Ct. at 2505).  Indeed, lessors who violate the Ordinance may be subject to fines for conduct that is not criminalized under 8 U.S.C. § 1324.  On its face, then, the Ordinance does not overlap with the federal anti-harboring crime or retard the federal government's exclusive prosecutorial discretion.[19]

---

[19] The Eleventh Circuit recently concluded that an Alabama statute that criminalized "harboring an unlawfully present alien by entering into a rental agreement with that alien" was conflict-preempted by § 1324.  *United States v. Alabama*, 691 F.3d 1269, 1285 (11th Cir. 2012), *cert. denied* 569 U.S. ___ (2013) (No. 12-884).  Alabama did not seek review of the Eleventh Circuit's ruling on the rental provision.  *See* Petition for Writ of Certiorari, *Alabama*, 569 U.S. ___ (No. 12-884), at 10.

It is inappropriate to apply the logic of *Alabama* to this case for two reasons.  First, even if one believes that the state cannot prohibit the exact conduct as the federal government so long as immigration is involved, an anti-harboring statute is about the "harborer," not the illegal alien.  It is not a regulation of immigration except indirectly in that it forecloses an *illegal* means that could assist illegal aliens in staying in the United States.  This is quite different from the *legal* discretion of the government to allow some illegal aliens to remain in the United States.  Second, although the Eleventh Circuit concluded that the Alabama statute was conflict-preempted by § 1324, it acknowledged that the rental provision did not penalize the same conduct as § 1324.  *Alabama*, 691 F.3d at 1285, 1288.  Instead, it concluded that the rental provision was problematic because it "effectuates an untenable expansion of the federal

No. 10-10751

To elaborate, lessors in Farmers Branch are potentially criminally liable under the Ordinance if: (1) they lease to individuals who never apply for or obtain a residential occupancy license; or (2) they continue to lease to individuals whose residential occupancy license has been revoked because they are "not lawfully present." There is other potential liability relating to a lessor's administrative duties under the Ordinance, such as maintaining a copy of the residential occupancy license of each known occupant of their properties. None of these violations would subject the lessor to criminal liability under § 1324.

First, a "prosecution" under the Ordinance for leasing to an individual who never applies for nor obtains a residential occupancy license would not rely, in any way, on the immigration status of the renter. Liability would be based solely on a failure to comply with the Ordinance's licensing requirements. In contrast, a prosecution under § 1324 would necessarily focus on the immigration status of the renter and whether the other three elements of a § 1324 violation could be established.[20] The Higginson opinion charges that focusing on the licensing regime (rather than the immigration status of the individuals) is a "distinction without a difference." Higginson Op. at 18 n.15.

harboring provision." *Id.* While we disagree with the Eleventh Circuit's conclusion that a state law is conflict-preempted merely because it criminalizes conduct that federal law does not, as discussed *infra*, we similarly find that the Ordinance does not penalize the same conduct as § 1324.

[20] The four elements of a harboring violation are defined as: (1) an unlawfully present alien; (2) that the defendant conceals, harbors, or shelters; (3) while knowing or recklessly disregarding that the alien in unlawfully present; and (4) in a way that substantially facilitates the alien remaining in the United States. *United States v. Shum*, 496 F.3d 390, 391–92 (5th Cir. 2007).

104

This characterization does not withstand closer scrutiny because the elements of the respective "crimes" evince no conflict.[21]

Second, a prosecution under the Ordinance for continuing to lease to an illegal alien whose residential occupancy license has been revoked could not trigger a federal anti-harboring prosecution. This violation could occur only after the renter completes an application. The application process requires a renter to provide his name and the address where he plans to reside. Therefore, even if the lessor continued to lease to the renter after the renter's license was revoked, it would be impossible to establish that the lessor was "hiding" the illegal alien from detection as is required for an anti-harboring conviction. *See United States v. Varkonyi*, 645 F.2d 453, 459 (5th Cir. 1981) (interpreting the statutory phrase "harbor, shield, or conceal" to imply that "something is being hidden from detection"). Instead, it would be public knowledge where the "not lawfully present" alien was residing.

As we have shown, the Ordinance does not provide for "arrest," "detention," or "prosecution" of illegal aliens, nor does it create the local

---

[21] The *Odebrecht* case relied on by the Higginson opinion is inapposite. *Odebrecht Const., Inc. v. Sec., Fl. Dept. of Transp.*, 715 F.3d 1268 (11th Cir. 2013). *Odebrecht* held that Florida's recent statute (the "Cuba Amendment") preventing companies that do business with Cuba from bidding on state public contracts was conflict-preempted by federal law concerning trade with Cuba. The court described at length the extensive, exact, and "nuanced" federal statutes and explicit delegations of Presidential power in this sensitive area of foreign relations. *Id.* at 1275–78. The court juxtaposed the Florida statute's explicitly broader definitions that revealed an "obvious, direct and apparent conflict between" federal and state law. *Id.* at 1280. Unlike *Odebrecht*, the Higginson opinion can point to only one federal criminal statute, the anti-harboring crime, that has anything to do with the "housing" of illegal aliens; there is simply no other direct federal immigration law or policy on this subject. And as we have shown, there are no obvious and direct conflicts with this single statute. For this reason, the Higginson opinion's reliance on *Crosby v. Foreign Trade Council*, 530 U.S. 363, 120 S.Ct. 2288 (2000) (overturning a Massachusetts statute preventing trade with Burma), is also misplaced.

equivalent of anti-harboring criminal offense. Without criminal prosecution as its pivot, the Higginson conflict analysis fails. Moreover, if there is doubt about the scope of the Ordinance's criminal provisions, the *Salerno* principle shields the provisions from facial unconstitutionality, and elementary principles of judicial restraint would afford the state courts the first opportunity at construing the Ordinance.[22]

### B. Flawed Conflict-Preemption Analysis

But even if we accept, counter-factually, Judge Higginson's characterization of the Ordinance, his conflict-preemption analysis is seriously flawed.

On the most general level, the Higginson opinion embodies the troubling concept that a federal criminal statute, standing alone, can preempt local police power regulations. The fact that the federal government has chosen to criminalize the behavior of harboring illegal aliens does not indicate Congress's intent to prevent local authorities from legislating within their traditional spheres of concern. That Congress, for instance, has enacted criminal laws prohibiting certain sales and transfers of firearms has no implied preemptive impact on states' regulation of firearms. That Congress enacted a federal crime of bank robbery does not prevent localities from applying local zoning laws to banks or prosecuting for embezzlement or robbery victimizing the bank. Dual sovereignty in our federal system envisions precisely the possibility of such

---

[22] In *DeCanas*, the Court remanded for further consideration of such issues as whether the state law defined unauthorized aliens in conflict with federal law. The Court held that California courts should decide in the first instance whether and to what extent the state law, enforced with appropriate regulations, might conflict with federal laws. *DeCanas*, 424 U.S. at 364–65, 96 S. Ct. at 940–41. The Higginson opinion displays no such deference.

overlapping regulations.    Certainly, when both the states and federal government choose to regulate similar activity, there will be occasions when a local enforcement officer pursues a case that federal agents let go, and vice versa.  But courts do not normally call this phenomenon "conflict preemption." Instead, we call it "federalism."

For implied conflict preemption to occur, a direct conflict with federal objectives must be shown.  The Supreme Court has emphasized that "[i]mplied preemption analysis does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives'; such an endeavor 'would undercut the principle that it is Congress rather than the courts that preempts state law.'" *Whiting*, 131 S. Ct. at 1985 (Roberts, C.J., controlling opinion) (quoting *Gade*, 505 U.S. at 111, 112 S. Ct. at 2390 (Kennedy, J., concurring in part and concurring in judgment)).  Despite the Higginson opinion's attempt, the conflict between the Ordinance and the federal crime of harboring illegal aliens is illusory.

In several ways, the rationale of the Higginson opinion was rejected by the Supreme Court in *DeCanas*, a case that arose when the California Labor Code was amended to prohibit the knowing employment of illegal aliens.  The statute imposed a potential fine on employers between $200 and $500 for each offense.  Among many arguments for preemption, the statute's challengers asserted a conflict with the federal anti-harboring crime, which at that time expressly exempted from felony status "employment (including the usual and normal practices incident to employment)."  *DeCanas*, 424 U.S. at 360, 96 S. Ct. at 939.  Despite the exculpatory proviso, the Court declared this "at best evidence of a peripheral concern with employment of illegal entrants." *Id.*

No. 10-10751

The Court "admonished that 'due regard for the presuppositions of our embracing federal system, including the principle of diffusion of power not as a matter of doctrinaire localism but as a promoter of democracy, has required us not to find withdrawal from the States of power to regulate where the activity regulated was a merely peripheral concern of the (federal regulation).'" *Id.* at 360–61, 96 S. Ct. at 939 (quoting *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236, 243, 79 S. Ct. 773, 779 (1959)). In a footnote, the Court repeated:

> Accordingly, neither the proviso to 8 U.S.C. § 1324(a) nor Congress' failure to enact general laws criminalizing knowing employment of illegal aliens justifies an inference of congressional intent to pre-empt all state regulation in the employment area. Indeed, Congress' failure to enact such general sanctions reinforces the inference that may be drawn from other congressional action that Congress believes this problem does not yet require uniform national rules and is appropriately addressed by the States as a local matter.

*Id.* at 361 n.9, 96 S. Ct. at 939 n.9.

The analogy with the holding of *DeCanas* is straightforward. The federal anti-harboring crime exhibits at best a peripheral concern with rental housing for illegal aliens, while housing regulations are within the core powers of local government. Just as the Court in *DeCanas* could not infer Congressional intent to prevent state regulation from the existence of one federal criminal statute and the paucity of other federal law governing alien employment, we should not infer an intent to proscribe local housing regulations where no other evidence

of federal statutory concern exists.[23]  That *DeCanas* was a field preemption case and Judge Higginson asserts conflict preemption in this case is of no moment.  For conflict preemption to exist, there must be a direct conflict with or impairment of the criminal anti-harboring statute.  The analogy to *DeCanas* emphasizes the utter absence of a core relation, and thus the absence of the necessary conflict, between the federal crime and the Ordinance.

Moreover, contrary to the methodology of the  Higginson opinion, *DeCanas* does not treat the California Labor Code provision as a "criminal" statute despite its enforcement by fines.  The prohibition involved "state authority to regulate the employment relationship."  *Id.* at 357, 96 S. Ct. at 937.  The Court also described California's law as "fashioned to remedy local problems, and operat[ing] only on local employers, and only with respect to individuals whom the Federal Government has already declared cannot work in this country."  *Id.* at 363, 96 S. Ct. at 940.  Critically, the Higginson opinion succeeds only if it correctly classifies the Ordinance as an attempt to "arrest," "detain," and "prosecute" illegal aliens.  But that is not the way *DeCanas* approached the issue, even though the California statute was passed with the intent to deter illegal aliens from working, and gaining the wherewithal to

---

[23] Judge Higginson claims 8 U.S.C. § 1229(a)(1)(F)(i)—requiring aliens to have an address at which to receive removal paperwork—is evidence that the Ordinance "obstructs the goal of bringing potentially removable non-citizens to the attention of the federal authorities."  This conclusion does not logically flow from the § 1229(a)(1)(F)(i) requirement.  Setting aside the fact that the address does not have to be housing owned or rented by the alien in question, once an alien is subject to removal proceedings, the federal authorities are obviously aware of the alien's presence.  Moreover, aliens who are unlawfully present but are not yet the subject of removal proceedings have no requirement to provide an address to the Attorney General.  It is odd to suggest that the Ordinance—which potentially alerts the federal government to the presence of unlawfully present aliens that are not the subject of removal proceedings, *see* ORDINANCE 2952 §§ 1(B)(7), 3(B)(7)—somehow obstructs the federal removal power.  Higginson Op. at 9–10.

reside, in the state.

In departing from the commonsense *DeCanas* analysis, the Higginson opinion's approach fundamentally mischaracterizes the Ordinance. It is a licensing-based regulatory program, just as the licensing of drivers is a regulatory program to foster, *inter alia*, road safety and vehicle insurance. No one characterizes drivers' license regulations as principally "criminal" even though anyone, including an illegal alien, may be arrested, detained, and cited for a Class C misdemeanor for having no license or producing a license to which he is not entitled. No one characterizes local zoning regulations as "criminal" because fines may be imposed, if, for instance, a landlord knowingly rents a dwelling that fails to meet minimum habitability standards. All regulatory regimes must have enforcement mechanisms, but their object is to secure voluntary compliance. No doubt, Farmers Branch hopes that if it is finally permitted to enforce the Ordinance, landlords and renters will generally comply, and most illegal aliens will avoid obtaining rental licenses and make other housing choices. Penalties are the last, and usually a rare, step in enforcement and must not be the tail wagging the dog for preemption purposes.

But even if the Ordinance's enforcement provisions should be highlighted for purposes of conflict preemption analysis, they do not impinge on federal enforcement of immigration law, as the Higginson opinion contends. First, because the federal harboring statute has only limited, if any, preemptive power against a local licensing regime, the fact that landlords must submit to the regulation or be liable for a fine involves no inherent conflict with the crime of "harboring." Indeed, compliance is consistent with the intent of the anti-harboring statute to prevent concealment and shielding of illegal aliens

from federal attention.  *Cf. United States v. Rubio-Gonzalez*, 674 F.2d 1067, 1073 n.5 (5th Cir. 1982) ("Congress intended to broadly proscribe any knowing or willful conduct *fairly within any of these terms* [(conceal, harbor, or shield)] that tends to substantially facilitate an alien's remaining in the United States illegally." (emphasis added)); *United States v. Chon*, 713 F.3d 812, 819 (5th Cir. 2013) (per curiam) ("Chon's contention that he simply did not prevent illegal aliens from renting a room at the Gateway Hotel is belied by his [active] facilitation of their presence and his willingness to allow alien smugglers to rent rooms on behalf of groups of illegal aliens.").

Second, the "arrest," "detention," and "prosecution" functions of local officers who may enforce the Ordinance do not collide with federal decisions regarding "removal" of illegal aliens.  As has been explained, violators of the Ordinance may be detained only until they post bond for their fines.[24]  They are not "removed" or subjected to potential removal from the United States, or even from Farmers Branch.  This limited enforcement authority plays no role in the process whereby the federal government detains and exercises discretion in deciding whom to remove from the United States.  Enforcing the Ordinance is thus quite different from the Arizona S.B. 1070 provision that, if upheld by the Supreme Court, would have authorized local law enforcement to arrest and detain persons suspected of being deportable solely to assist and encourage the federal removal efforts.  The Court found preemption, holding that the enforcement of the immigration laws has been assigned by Congress to

---

[24] We note again our disagreement with Judge Higginson's suggestion that an individual may be detained under the Ordinance for being "unlawfully present."  Even if this flawed reading is accepted, it is not fatal to the Ordinance.

comprehensive federal regulation. *Arizona*, 132 S. Ct. at 2502. The Ordinance, in contrast, claims no impingement on determinations of who may remain in or be detained for deportation from this country.

The Higginson opinion also criticizes the Ordinance because the federal anti-harboring crime penalizes only the individual who harbors the illegal alien, while under his interpretation of the Ordinance, the alien may be penalized as well. The opinion seeks support from the Supreme Court's rejection in *Arizona* of § 5(C) of S.B. 1070 that crafted a criminal sanction (up to $2500 fine and six months imprisonment) for an alien illegally seeking employment. The Court conducted a thorough analysis of this provision in the context of recent federal laws that regulate, to some degree, the employment of illegal aliens. In finding conflict preemption, the lynchpin of the Court's reasoning was that "Congress made a deliberate choice not to impose criminal penalties on aliens who seek" employment. *Id.* at 2504. No similar argument can be made that Congress intended the anti-harboring statute to preempt local housing regulations or that Congress deliberately excluded aliens from the scope of its non-existent regulations. We cannot properly infer Congressional intent from silence. The Higginson opinion further asserts that the Ordinance "impermissibly allows for local officers to arrest and detain non-citizens based on a classification ["unlawful presence"] that does not exist in federal law." Relying on generalities about immigration classifications and discretionary determinations, the opinion implies that rogue local officials will inflict "criminal" sanctions on aliens who might in fact be authorized to be in the United States. Like the Reavley and Dennis opinions, however, this fear simply overlooks the facts. The building inspector has no authority to decide

immigration status independently. He must defer to the binding result of inquiries to federal officials, made on two occasions, at least sixty days apart, that a particular tenant licensee is not lawfully present in the United States. The building inspector's inquiries are no different from those made by hundreds of local governments daily to the federal government to ascertain immigrants' status and qualifications for benefits ranging from housing assistance to student loans to medical care and disability income. It is the federal government's duty to get the answers right, not the building inspector's uninformed prerogative to guess. Further, the term "unlawful presence" must have some meaning to the federal government, as that term, or closely related terminology, frequently appears in federal statutes and regulations. *See supra* note 13.[25] The Eighth Circuit pithily rejected this contention: "It seems obvious that, if the federal government will be unable to definitively report that an alien is 'unlawfully present,' then the rental provisions are simply ineffectual. Plaintiffs and the United States do not explain why a local law is conflict-preempted when the federal government has complete power to avoid the conflict." *Keller*, 2013 WL 3242111, at *8.

Finally, the Higginson opinion declares that the Ordinance allows state

---

[25] There is also rich irony in the Higginson opinion's assertion that "unlawful presence" is too vague to allow enforcement of the Ordinance consistent with federal immigration law. If this were true, it would be hard to see how the federal government could prosecute violations of the federal anti-harboring felony statute. The anti-harboring crime, as earlier noted, applies if a defendant knowingly, or with reckless disregard, harbors or conceals an alien who is "in the United States in violation of law." If a building inspector cannot rely on two inquiries of the federal government for a determination of "unlawful presence," how could the federal government prove beyond a reasonable doubt that a harborer knew or recklessly disregarded aliens' status as immigration law violators? Just as no one seriously asserts the vagueness of the anti-harboring felony, so should the assertions of vagueness in the Ordinance's "unlawful presence" determination fail.

officers to "hold[] aliens in custody for possible unlawful presence without federal direction and supervision."   Higginson Op. at 7 (citing *Arizona*, 132 S. Ct. at 2509).   If this were true, the Ordinance would fail under the reasoning of *Arizona* in regard to § 5(C) of S.B. 1070.   But it is untrue, and significantly so.   The illegal alien who might be held in "custody" if he attempted to rent in Farmers Branch without a license or who falsified the information used to get a license could be held in custody for one violation, and one alone:  violating the Ordinance.   He could only be held long enough to have a citation issued and to secure a bond for the potential fine.   This is comparable to the alien's being held, until he procures a bond for the fine, because he does not furnish a proper driver's license.   If local detention is improper in these circumstances without "federal direction and supervision," then illegal aliens would receive functional immunity from valid regulatory ordinances that citizens do not possess.

For all these reasons, even if the Ordinance's criminal provisions are interpreted according to the Higginson opinion, they are not an obstacle to the enforcement of the anti-harboring crime or federal immigration removal decisions.

## C.  Severability of the "Criminal"  Provisions

The Higginson opinion asserts that the Ordinance "lacks functional coherence without its criminal offense and penalty provisions . . .," and accordingly, the opinion disregards the Ordinance's strong severability clause. The primary rationale in the Higginson opinion's discussion is the incorrect assumption that the Ordinance's provisions are so "interdependent" as not to be severable under Texas law. *Rose v. Doctors Hosp.*, 801 S.W.2d 841, 844 (Tex.

No. 10-10751

1990). As we have noted, the non-severability determination is a *sine qua non* of the Higginson opinion. Unless the "criminal" provisions are non-severable, the Ordinance cannot be overturned in full. The opinion's non-severability analysis fails, however, because it depends on the misreading and mischaracterization of the Ordinance at the heart of the Higginson opinion.[26]

Severability raises a question of Texas law. The Texas Supreme Court has explained the test for severability as follows:

> When, therefore, a part of a statute is unconstitutional, that fact does not authorize the courts to declare the remainder void also, unless all the provisions are connected in subject-matter, dependent on each other, operating together for the same purpose, or otherwise so connected in meaning that it cannot be presumed the legislature would have passed the one without the other. The constitutional and unconstitutional provisions may even be contained in the same section, and yet be perfectly distinct and separable, so that the first may stand though the last fall. The point is not whether they are contained in the same section, for the distribution into sections is purely artificial; but whether they are

---

[26] Judge Dennis asserts that we should not consider the Ordinance's severability clause because the City failed to raise it throughout these proceedings. As a factual matter, Judge Dennis is incorrect. The City's *en banc* brief observed that the Ordinance contains a severability clause and described its impact on our review. *See* Appellant's En Banc Br. at 13. Waiver is also inappropriate here because the impact of the severance clause is a pure question of law. As such, it falls within the "well-settled discretionary exception to the waiver rule [that] exists where a disputed issue concerns 'a pure question of law.'" *New Orleans Depot Servs., Inc. v. Dir., Office of Worker's Comp. Programs*, ___ F.3d ___, 2013 WL 1798608, at *2 (5th Cir. Apr. 19, 2013) (en banc) (quoting *Texas v. United States*, 730 F.2d 339, 358 n.35 (5th Cir. 1984)).

More importantly, applying our waiver doctrine where the text of the Ordinance itself includes the severance language at issue is deeply problematic. We must give effect to every word of a statute, regardless of whether a litigant draws our attention to the applicability of a particular statutory provision. *See, e.g.*, *Lowe v. SEC*, 472 U.S. 181, 207 n.53, 105 S. Ct. 2557, 2572 n.53 (1985) ("[W]e must give effect to every word that [the legislature] used in the statute."); *United States v. Menasche*, 348 U.S. 528, 538–39, 75 S. Ct. 513, 520 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute." (internal quotation omitted)).

> essentially and inseparably connected in substance. If, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must stand.

*Id.* (quoting *W. Union Tel. Co. v. State*, 62 Tex. 630, 634 (1884)).

Texas law is consistent that "[i]n the construction of statutes, if it can be lawfully done, it is the duty of the court to construe a statute so as to render it valid." *Id.* (quoting *Sharber v. Florence*, 115 S.W.2d 604, 606 (Tex. 1938)). When confronted with a statute that is unconstitutional in part, Texas courts routinely delete the portion of the statute that renders it unconstitutional, leaving the remaining aspects of the statute, so long as the remaining statute is "capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected." *Id.*; *see, e.g., Comm'n for Lawyer Discipline v. Benton*, 980 S.W.2d 425, 441 (Tex. 1998) ("The unconstitutionality of one part of a statute does not require us to invalidate the entire statute unless the unconstitutional provision is not separable from the remainder."); *Quick v. City of Austin*, 7 S.W.3d 109, 117 (Tex. 1998) ("If a reviewing court were to determine that one portion of a water control ordinance was invalid, the court would therefore be required to 'modify' the ordinance to delete the invalid portion if the remainder of the ordinance was complete in itself and capable of being executed in accordance with the apparent legislative intent.").

The Ordinance states:

> The terms and provisions of this ordinance are severable and are governed by Section 1-12 of the Code of Ordinances, City of Farmers Branch, Texas, as amended. If the application of this

ordinance to any person, entity, or circumstance is invalid, the invalidity does not affect other applications of the ordinance that can be given effect without the invalid application, since the same would have been enacted by the City Council without regard to any such invalid application.

ORDINANCE 2952, § 6.

The severability clause here states that if an application of the Ordinance "to any person, entity, or circumstance" is invalid, the invalidity does not affect any other application "that can be given effect without the invalid application." Not only that, but by incorporating a reference to the City's general ordinance governing severability, Section 1-12, the Ordinance manifests a clear intent that even general City regulations should not be allowed to undermine its effectiveness. The severability clause emphasizes the City Council's determined attempt to maintain whatever part of the Ordinance is valid.

Contrary to the Higginson opinion, the Ordinance's primary purpose is to effectuate licensing of apartment and single family rentals under the supervision of the building inspector. The requirements pertinent to obtaining and maintaining residential occupancy licenses are carefully spelled out. The "Offenses" that constitute violations of the Ordinance are, first and foremost, grounds for civil enforcement by the building inspector, who can suspend a landlord's rental license and prevent rent collection during the suspension period based on the violations. *Id.* §§ 1(D)(5)-(8), 3(D)(5)-(8). The building inspector may also revoke a residential occupancy license, forcing the renter's removal from the premises. *Id.* §§ 1(D)(4), 3(D)(4). These are effective, stand-alone enforcement measures. Although the City might find criminal enforcement measures desirable, they are not necessary to assure substantial

## No. 10-10751

local compliance. Licenses could still be revoked, under a regulatory regime, without bringing criminal prosecutions to bear.[27]  Put in terms of Texas severability law, the invalidity of any Class C misdemeanor measure does not prevent the building inspector from carrying out his duties, providing licenses, making "unlawful status"inquiries to the federal government, and shutting down the leasing of single-family dwellings or apartments to non-compliant renters.

No other functional analysis of the Ordinance makes sense.  By analogy, if driving without a license were judicially disapproved as a Class C misdemeanor offense, Texas could still require drivers to qualify for and carry licenses, on penalty of civil suspension for violations.  As a further analogy, a court could judicially excise criminal environmental violation penalties, but withholding licenses to store or dispose of regulated substances would remain an effective sanction.  Regarding the Farmers Branch licensing scheme as unworkable without its criminal enforcement provisions, in sum, views the Ordinance through the wrong end of the telescope.  Texas's strong policy favoring severability compels severability, if this court finds the "criminal" enforcement provisions constitutionally infirm.

---

[27] That the Ordinance is a complete regulatory scheme absent its criminal provisions can be seen through the language of the statute.  The inspector's suspension action is not premised on a formal "criminal" charge, prosecution, or conviction—even though, as Judge Higginson points out, the suspension is "premised on the landlord having committed an offense." Higginson Op. at 24.  For example, it may be an "offense" for a child to commit a truancy violation, but the child need not be "prosecuted" before school authorities can impose other, lesser penalties on the misconduct.  As far as the Higginson opinion is concerned, if all you have is the hammer of criminal law, then every problem is a (criminal) nail.  Like most regulatory programs, however, the Ordinance offers both civil and criminal enforcement procedures, and they are not interdependent.

## D. Judicial-Review Provision

We agree with Judge Higginson in one respect: federal law preempts the aspect of the judicial review section that "allows state courts to assess the legality of a non-citizen's presence absent a 'preclusive' federal determination." Higginson Op. at 20. The judicial review portion of the Ordinance, as enacted, allows a state court to review whether the occupant is lawfully present, while giving the federal determination "a rebuttable presumption as to the individual's immigration status" and making conclusive only those federal determinations that "would be given preclusive effect on the question." §§ 1(E)(4) & (5), 3(E)(4) & (5). Authorizing state courts to revisit federal determinations of immigration status opens the door for conflicting state-federal rulings on an immigrant's lawful status. This creates an obstacle to Congress's setting out "the sole and exclusive procedure" for determining whether an alien may be admitted or removed from the United States. 8 U.S.C. § 1229a(a)(3). Therefore, the specific provisions of the judicial review section that authorize state courts to revisit federal determinations of immigration status are conflict preempted by federal law.

We disagree, however, with Judge Higginson's conclusion that the preempted aspects of the judicial review section are not severable.

Based on the Texas authorities cited in the preceding Section, we must determine whether the Ordinance—without the portion of the judicial review section that allows state courts to revisit federal determinations of immigration status—is "complete in itself, and capable of being executed in accordance with the apparent legislative intent." *Rose*, 801 S.W.2d at 844. Here, because the Ordinance contains a severability clause, the legislative

119

No. 10-10751

intent to sever the unconstitutional portion of the Ordinance is clear. The only question is whether the remaining Ordinance is "complete in itself."

To resolve this question, we must consider how the Ordinance will operate without the preempted portions of the judicial review section. After deleting the conflict-preempted portions, the judicial review section of the Ordinance, in relevant part, provides:

> (4) In a suit for judicial review in which the question of whether the occupant is lawfully present in the United States is to be decided, that question shall be determined under federal law. In answering the question, the court shall be bound by any ~~conclusive~~ determination of immigration status by the federal government. A determination is conclusive ~~if, under federal law, it would be given preclusive effect on the question~~.

> (5) The court shall take judicial notice of any verification of the citizenship or immigration status of the occupant previously provided by the federal government. The court may, at the request of any party shall, request the federal government to provide, in automated, documentary, or testimonial form, a new verification of the citizenship or immigration status of the occupant pursuant to Title 8, United States Code, Section 1373(c). ~~The most recent determination of the immigration status of an individual by the federal government shall create a rebuttable presumption as to the individual's immigration status.~~

ORDINANCE 2952, §§ 1(E), § 3(E) (alterations added). The remaining part of the Ordinance's judicial review section provides that a state court is bound by the determination of immigration status by the federal government. Pursuant to the terms of the Ordinance, judicial review of "the question of whether the occupant is lawfully present in the United States" occurs only if a landlord or occupant has received a deficiency or revocation notice. *Id.* Such notices are issued only after the "federal government reports the status of the occupant as

an alien not lawfully present in the United States." *Id.* §§ 1(D), 3(D). Accordingly, any time judicial-review proceedings are initiated, the existing federal determination will bind the state court and it will be unable to make an independent determination of an individual's immigration status.[28] Without the conflict-preempted language, the Ordinance confines the state judicial inquiry to the federal determination, so there is no conflict between state and federal law as to whether an occupant is "lawfully present." *See Whiting*, 131 S. Ct. at 1981. Again—and *contra* Judge Higginson's contentions—if there is no conclusive determination from the federal government on the question, *no license will be revoked*.

Because the preempted portions of the judicial review section can be removed from the Ordinance without impairing any other aspect of the Ordinance, including the ability to seek judicial review of a deficiency or removal notice, the Ordinance remains "complete in itself, capable of execution in accord with the legislature's intent." *Rose*, 801 S.W.2d at 844. Therefore, the preempted portions of the judicial review section can be severed, leaving a valid law.

## V. Conclusion

This case presents a narrow legal issue: whether federal law preempts

---

[28] The only additional evidence that would be allowed under the terms of the Ordinance is a new verification of citizenship or immigration status from the federal government. *See* ORDINANCE 2952, §§ 1(E)(5), 3(E)(5). The state court may request the new verification on its own motion, and the state court is required to request a new verification at the request of any party. *Id.* This ability to seek a new verification of the occupant's citizenship or immigration status—which enables the tenant to confirm the existing federal determination—does not place the Ordinance in conflict with federal law. *See Whiting*, 131 S. Ct. at 1981 n.7 ("Giving an employer the chance to show that it did not break the state law certainly does not place the Arizona regime in conflict with federal law.").

the Ordinance. The answer under well-established law is straight-forward: it does not. The three opposing opinions reach a different conclusion based on (1) a failure to afford the Ordinance (as a local housing regulation within the police power) the presumptive constitutionality that it deserves; (2) broad and unsupported constructions of Supreme Court precedent, (3) misconceptions about how the Ordinance operates, and (4) contrived conflicts between the Ordinance and federal law.  Furthermore, even if one accepts the Higginson opinion's conflict-preemption analysis, that opinion falters in its final step because the judicial review and criminal enforcement provisions are severable under Texas law.  For these reasons, we respectfully dissent.